[Crim. No. 10473. In Bank. Nov. 27, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. CLARENCE LEE McDOWELL, Defendant and Appellant.

Carl B. Shapiro, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Derald E. Granberg, Deputy Attorney General, for Plaintiff and Respondent.

MOSK, J.—Defendant was charged by indictment with the following crimes: robbery of Bernadette Henderson (count I), assault of Bernadette Henderson with intent to commit rape (count II), assault of Bernadette Henderson by means of force likely to produce great bodily harm (count III), burglary (count IV), murder of Mildred Pedrick (count V), and robbery of Mildred Pedrick (count VI). He entered pleas of not guilty and not guilty by reason of insanity. The jury acquitted him on count II and convicted him on all other counts. In subsequent phases of the trial the jury found him sane and fixed the penalty on the murder count at death. The appeal is automatic. (Pen. Code, § 1239, subd. (b).)

The record amply supports defendant's contention that his counsel did not understand the settled rule that evidence of mental abnormality not amounting to insanity is admissible on the guilt phase of a trial to negate the specific mental states put in issue by the not guilty plea. (*People* v. *Wells*

(1949) 33 Cal.2d 330 [202 P.2d 53]; *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492].) As this fundamental misunderstanding deprived the defendant of his constitutional right to effective representation of counsel, the judgment must be reversed.

*The robbery and assault of Bernadette Henderson.* On September 12, 1965, Miss Henderson drove to the Sainte Claire Hotel to meet her fiancé. Defendant was standing in the entrance to the hotel garage. He asked her how long she expected to park, and gave her a stub. She drove to a lower level, parked, and got out of her car.

At the trial Miss Henderson had no recollection of the ensuing events, because of amnesia caused by a brutal beating administered by defendant. She was found some 45 minutes later, lying injured and unconscious in a stairwell leading from the basement level to the ground floor of the garage. Her head was battered and bleeding, her skirt was pulled up, and she was naked from the waist down. Her open purse was nearby, its contents scattered and ten dollars missing. Her underclothes were discovered in a pile at the ground level of the staircase. At that location the elevator door mechanism had been jammed by a folded piece of paper, preventing the elevator from operating, and a lampshade from a wall fixture had been placed on the floor. Fingerprints lifted from the lampshade were identified as those of defendant. A number of other persons had seen defendant in the vicinity of the hotel garage that afternoon.

In a statement to the police following his arrest, defendant related that he gave Miss Henderson a parking stub and saw her drive down to the basement level. He jammed the elevator door, removed the lampshade and unscrewed the light bulb. Realizing that the stairwell was then so dark that his victim might become suspicious, he replaced the bulb but did not have time to put the shade on as well. As Miss Henderson appeared at the top of the stairs, he seized her purse. She put her hand into a large knitted bag she was also carrying; fearing she was reaching for a weapon, he grabbed her wrists and pushed her down the stairwell. At the bottom she began screaming, and, according to defendant, "I quieted her down. I hit her a few times." After striking four blows on her head with his fist, defendant ransacked her purse and took her money.

He started to leave, but returned when he saw someone coming. Miss Henderson screamed again, and he gave her

another blow on the side of the head. As she was still groaning, he tried to tie her skirt over her head. She grabbed at him, and he kicked her in the face. He then pulled off her underclothes, assertedly planning to rape her, but he changed his mind because of the possibility of being caught in the act. He further stated that he had been "hanging around" the hotel for one or two hours prior to attacking Miss Henderson, and that "I just thought maybe it might be an easy way of getting me some money. . . ."

*The burglary of Mrs. Willig's laundromat.* On September 19, 1965, Mrs. Macy Willig entered her laundromat and discovered defendant raking candy out of a broken candy machine. In response to her challenge defendant explained, "I walked by and saw this machine broken so I thought I'd help myself." After she told him she was going to keep him there until someone came, defendant pulled out his billfold and offered to pay for the candy he had taken. When Mrs. Willig turned to wave to the driver of a passing car, defendant struck her in the face, pushed her away from the door, and ran out.

*The robbery and murder of Mildred Pedrick.* On September 23, 1965, two college students saw defendant standing in the doorway of a different laundromat. A half hour later, screams were heard issuing from the laundromat and witnesses saw a man run out and disappear up the street. Miss Pedrick, an elderly retired nurse, was found dying in the laundromat doorway. A knife lay on the floor nearby. An autopsy disclosed that she had been stabbed once in the face and several times in the chest; her hands and arms also bore multiple cuts typical of those suffered by a person resisting a knife attack.

In a statement to the police defendant said that he had followed Miss Pedrick into the laundromat, helped her operate the washing machines, and waited while she did her laundry. He had watched her purse when she opened it for change, and knew she had some money in it. She started to leave by the back door, when he put his hand over her mouth and told her not to scream. He seized her purse and ran towards the door. Miss Pedrick began screaming, and defendant dropped the purse, ran back, and seized her again. He "flashed" his knife at her, assertedly to make her be quiet. He walked her back to the purse and made her bend over so that he could pick it up while keeping her mouth covered with his other hand, " 'cause she still acted like she wanted to scream a little." As he went to take the money from her purse, she jerked her head free and screamed again. He then

stabbed her, and ran out with the purse. In his statement defendant said that he had purchased the knife for the purpose of using it to "scare 'em [i.e., his future women victims] just long enough to get their purse," and that when he attacked Miss Pedrick, "I was kind of low on money at the time and I didn't really plan on hurting her, . . . all I wanted to do was get a little money."

We meet at the outset defendant's contention that his trial counsel's misunderstanding of the *Wells-Gorshen* rule deprived him of his constitutional right to effective representation. (*Powell* v. *Alabama* (1932) 287 U.S. 45, 71 [77 L.Ed. 158, 171-172, 53 S.Ct. 55, 84 A.L.R. 527]; *People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) However reluctant a reviewing court may be to give credence to such a charge, the record of this case brings it squarely within the facts and law of *Ibarra*.[1]

First, much evidence was brought out by defense counsel during the trial of the plea of not guilty by reason of insanity that would have been relevant to a defense of diminished capacity on the issue of guilt.[2] To begin with, defendant's extremely unstable childhood and adolescence was explored. Born an illegitimate Negro, he was left with his elderly grandparents in Louisiana at the age of eight months. He soon developed into a problem child, given to fits of uncontrollable rage and wanton, senseless destruction. When he was 13 years old he was brought to California to live with his mother and stepfather. His earlier tendencies became more acute, and he engaged in bizarre and irrational behavior both at home and at school. He also exhibited a morbid interest in women's underclothes, and began wearing them instead of his own.

Soon after his fourteenth birthday he was referred to the Monterey County Child Guidance Clinic, and spent seven months under psychiatric treatment. His doctors were of the opinion that he was mentally disturbed and needed additional

---

[1]We recognize there are two superficial distinctions between this case and *Ibarra*. Here, defendant was represented by retained rather than appointed counsel; but although that fact is "important" it is "not conclusive." (*In re Rose* (1965) 62 Cal.2d 384, 389 [42 Cal.Rptr. 236, 398 P.2d 428].) It is also true that defendant had two such counsel at trial; yet while one participated in certain portions of the proceedings, it was the other, now deceased, who assumed by far the major role in presenting the defense. Accordingly, references in the ensuing discussion to "defense counsel" are to the latter alone.

[2]There was, of course, rebuttal evidence introduced by the prosecution; but we are concerned at this point with the existence of potential defense evidence, not with its weight.

care, and he was admitted to the Neuropsychiatric Service of the Monterey County Hospital. Shortly after his discharge the county probation authorities considered him to be "uncontrollable" and referred him to Napa State Hospital as potentially psychotic. After a period of observation he was discharged with a diagnosis of "transient situational personality disturbance." His mother thereafter unsuccessfully sought his readmission to Napa.

When defendant was 15 years old his mother was herself admitted to Agnews State Hospital for a period of six months, during which time he lived with an aunt. Upon his mother's discharge, the family moved to Santa Clara County. Defendant soon became embroiled with the law, and was declared a ward of the court. For the remainder of his minority—some five years—he spent most of his time in institutions under the jurisdiction of the Youth Authority. Studies conducted in 1960 showed a regression in his behavior, and found him to be an "acutely disturbed" person with psychoneurotic tendencies. Two years later his probation officer observed defendant's "bizarre kind of behavior towards other people," concluded that he was "a real serious emotionally disturbed kid," and recommended referral to a psychiatric clinic. At the age of 18 defendant was admitted to a second mental hospital (Agnews) for further observation and diagnosis. Meanwhile, his homosexuality had been confirmed by institutional experiences, and he continued to wear women's underclothing whenever he could. Upon reaching the age of 21, he was discharged from his then current Youth Authority confinement at Vacaville; a few months later he committed the crimes of which he now stands convicted.

Expert testimony was also introduced bearing on the issue of defendant's mental condition. Dr. Winston Rankin, a staff psychologist at Agnews, reviewed defendant's background and history and administered a number of tests. The doctor testified that although defendant's abstract intelligence level was within the normal range for his age, he exhibited severe impairment of other ego functions such as control of impulses, predictability of behavior, and self-identification. The doctor testified that "a person who suffers from this kind of ego defect, faced with a situation of unbearable stress, easily breaks down into psychosis." Such a person's behavior would be "irrational . . . lacking in reason, *lacking in intent*, lacking in anything that makes wilfulness of behavior meaningful to another human being." (Italics added.) The witness then read from a report stating that "For Clarence the

human being including himself is a shadowy, ill-comprehended, poorly-defined, but definitely bestial entity whose impulses are too dangerous to be faced head-on. . . . People are seen as animals pushed out of their natural role with a marked capacity for acting out.'' A further report stated that defendant's ''controls were seen as both weak and brittle, and what with his low frustration tolerance and his inability to handle the impact of his environment, the controls broke down easily.''

Dr. Rankin further reported that defendant exhibited ''blunted affect,'' i.e., that his emotional response to a given act was either nonexistent or inappropriate, to a degree demonstrating the presence of mental illness. The doctor testified that ''I don't think he is capable of planning a crime,'' explaining that in ''Any situation that he sees as threatening, as most threatening to himself, he wouldn't be able to respond in a rational willful manner'' and ''in a very stressful situation such as the one he found himself in prior to the murder, . . . his behavior would be that of a person who has lost complete control of his actions.''

Dr. Jack Barsman, a clinical psychiatrist, testified that the situation prior to the murder would have produced in defendant the kind of stress he was incapable of handling except by ''blind rage.'' That stress, the doctor testified, ''reduced his psychological functioning to an extremely low level, maybe a level of a four year old, maybe a level less than that,'' i.e., to the level of a four-year-old ''falling apart, screaming and breaking things.'' The doctor concluded that defendant was in need of psychiatric treatment, and that even so, his prognosis was extremely poor and he should probably be confined in mental institutions for the rest of his life.

Secondly, the record demonstrates that defense counsel misunderstood the basic rule that would have allowed the foregoing evidence to be introduced in the guilt phase to negate the existence of specific intent. Counsel's opening statement to the jury seemed to suggest that such a defense, with supporting evidence, would be introduced on all counts as to which it was available.[3] But when the prosecution rested, counsel

---

[3]Thus defense counsel told the jury: ''Ladies and gentlemen, this boy lives in a world where to him it is a jungle. He hates the streets worse than hell. He likes institutions, jails, penitentiaries. His stepfather has given him h-e-l-l for everything he has done. He is driven to needless, senseless things, and the evidence will show that he is to himself an animal. He has been in the mental institution. He regards himself as being lower than an animal because they never had a mind to lose. He has been there twice, his mother. He regards himself as an animal or

announced he would offer a defense solely as to the count of assault with intent to commit rape. His theory on that charge was that defendant was a transvestite and homosexual, and hence could not have entertained a specific intent to have sexual intercourse with Miss Henderson. In the ensuing examination of witnesses, counsel deliberately and repeatedly limited the testimony to that precise issue. It soon appeared from counsel's remarks, however, that he imposed such limitation not as an informed, tactical decision, but because he mistakenly believed the law prohibited him from inquiring into other aspects of defendant's mental abnormality during the guilt phase.

Thus counsel elicited from defendant's mother a summary of her son's teenage years; but whenever the questioning turned to the details of defendant's commitment to Napa or difficulties with the law, counsel abruptly terminated the inquiry with the statement that ''we can't go into all these phases now.'' The witness thereafter testified she felt it was not safe for defendant to be in the company of his younger siblings, ''knowing his condition.'' When asked to explain the latter remark, she referred to his transvestitism ''and other things which I don't know whether it would be out of order for me to bring it out now or not.'' Counsel declined to let her do so, stating that ''I can only ask you about the transvestitism. I can't go into the other aspects of insanity. . . .'' Again, counsel inquired if defendant was admitted to Agnews solely because of his transvestitism or for other reasons as well; the witness replied that there were a number of other reasons, but counsel cut her off and said, ''We are not permitted to discuss them now. If we have to later we will. . . .'' Similarly, counsel told the witness ''we can't discuss now'' the troubles experienced by defendant when he was growing up in Louisiana and shortly after his arrival in California.

Counsel then called defendant and Dr. Rankin to testify on

lower and the world as a jungle and every human being is an animal and under stress, why, their own reports show his frustrations, the threshold where little things will knock him off, bring the rivers of hell into his mind where it is so low, it is weak, brittle and it is uncontrollably brittle, and that is the brain, the mental. . . .

''Ladies and gentlemen, the statements [of defendant] will be quite what you call consistent. He has a good, logical sequence of the facts in there, one, two, three. This happened and that happened, but where they pertain to him he cannot tell. He doesn't identify himself as a man. He doesn't identify himself at all. He is so disoriented he cannot represent himself under frustration or stress or pressure. He can't when that happens. He goes crazy.''

the limited issue of homosexuality as it related to the charge of assault with intent to commit rape, "inasmuch as this . . . does not deal with insanity or sanity, but only to the guilt [or] innocence." Counsel thereafter vigorously enforced his misconception of the law. For example, when the prosecutor asked defendant on cross-examination whether his I.Q. increased while he was in Vacaville, counsel objected on the ground that "this is going beyond the state of mind," and asserted that defendant's "mental condition" should not be inquired into because "there is a presumption here that I have to wait until the other phase of the trial." Likewise defense counsel declined to elicit from his own expert witness, Dr. Rankin, the substance of the latter's examination into defendant's "mental status," explaining he was limiting his question to homosexuality "because the other phase comes later." On cross-examination Dr. Rankin testified that transvestitism was "one of the reasons" why defendant was admitted to Agnews, and the prosecutor asked what the others were; defense counsel objected on the ground that "We are going into a phase now . . . that I am precluded from developing and, therefore, will not permit him to go into it. They won't let me go into it." Finally, when the prosecutor sought to ask his expert, Dr. Walter Rapaport, whether the defendant appeared coherent and comprehending during an interview with him, defense counsel objected that "we are not going into the sanity phase. I am not allowed to and I don't want him to. . . ."

Not surprisingly, the prosecutor thereafter argued to the jury that except for the evidence of transvestitism "there isn't anything in the record to show there was anything wrong" with defendant's mental condition. In his own oral argument, defense counsel revealed time and again his misunderstanding of the relevant rule of law. Thus he told the jury that he was not permitted to show defendant was "insane," but was "only allowed to show certain things as it applies to the charge of assault with intent to commit rape." Counsel then correctly informed the jury that "you can consider a man's emotional, nervous and mental makeup to decide the question of specific intent"; but he immediately restricted such evidence to "the limited purpose of deciding the question of rape. . . ."

Apparently referring to defendant's history of commitments to Napa and Agnews, counsel asserted that "Ladies and gentlemen, I can't go into that until we get into the insanity

phase of it, and they indicated that I promised something I can't deliver. . . . But to this phase I am limited to the homosexuality to show as to this girl there was never any attempt to rape." He conceded that defendant was committed to Agnews "not merely for transvestitism but we are limited to that here." He claimed that his purpose was "to show how crazy or unstable [a] person, emotionally, mentally," defendant was; yet he thereafter stated to the jury, "see, I am not permitted to show this man's true mental condition because there is a conclusive presumption."

In the closing portion of his argument counsel sought to persuade the jury that defendant was "emotionally impoverished," that his "controls" might be "brittle," that he has "no identification of himself," that the "sound of a female screaming like that drives him crazy," and that his response is totally "impulsive." Each of these arguments could have been supported by substantial evidence, as we have seen; but counsel had not introduced any such evidence because of his erroneous belief that it was inadmissible. Indeed, in his final remarks counsel told the jury that when defendant "pulled his knife out after she started screaming, this man was berserk. I believe the evidence later will substantiate [it], but you can't consider it."

■ A defendant who pleads not guilty manifests his desire to contest the issue by every means lawfully at his disposal, and it is the duty of his counsel to assist him in this endeavor by the preparation and presentation of his defense. Under our adversary system, of course, the choice of strategy and tactics remains committed to counsel's judgment. Accordingly, in appropriate cases counsel may justifiably decide to offer no affirmative defense and stand instead upon the presumption of innocence; or counsel may, as here, offer a defense on one count only of a multiple charge, standing on the presumption as to the remainder. But either of these courses of action presupposes that counsel is fully informed of the defenses that could actually be interposed on behalf of his client. ■ "It is counsel's duty to investigate carefully all defenses of fact and of law that may be available to the defendant, and if his failure to do so results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he is entitled." (*People* v. *Ibarra* (1963) *supra,* 60 Cal.2d 460, 464, and cases cited.)

■ It is settled in this state that on the trial of the issues raised by a plea of not guilty to a charge of a crime which requires proof of a specific mental state, competent evidence is

admissible to show that because of mental abnormality not amounting to legal insanity the defendant did not possess that mental state at the time he committed the act. As we said of the search and seizure principle involved in *People* v. *Ibarra* (1963) *supra,* 60 Cal.2d 460, 465, "This rule should be a commonplace to any attorney engaged in criminal trials." It was established almost two decades ago: "the defense, generally, has been well recognized since *People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53]." (*In re Hawley* (1967) 67 Cal.2d 824, 829 fn. 4 [63 Cal.Rptr. 831, 433 P.2d 919].) It was further developed in *People* v. *Gorshen* (1959) *supra,* 51 Cal.2d 716, and has frequently been discussed in appellate opinions, in law review articles, and in the standard works of reference. "It can no longer be doubted that the defense of mental illness not amounting to legal insanity is a 'significant issue' in any case in which it is raised by substantial evidence. Its purpose and effect are to ameliorate the law governing criminal responsibility prescribed by the M'Naughton rule. . . . This policy is now firmly established in the law of California. [Citations.]" (*People* v. *Henderson* (1963) 60 Cal.2d 482, 490-491 [35 Cal.Rptr. 77, 386 P.2d 677]; accord, *People* v. *Conley* (1966) 64 Cal.2d 310, 316-319 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Anderson* (1965) 63 Cal.2d 351, 364-366 [46 Cal.Rptr. 763, 406 P.2d 43].)

 We recognize that in the case at bar counsel may have been aware of the *Wells-Gorshen* doctrine in general terms, for it was apparently on this ground that he premised his defense to the charge of assault with intent to commit rape. But he seems to have erroneously believed that the doctrine was limited to the issue of defendant's sexual propensities, and could not also be invoked to negate the variety of specific mental states necessary to support convictions of the other crimes here charged. Counsel's view appears to have derived from his undue regard for the so-called "conclusive presumption of sanity on the guilt phase." Yet as we emphatically explained long ago in *Wells* (33 Cal.2d at p. 348), "the conclusive presumption of sanity is a conclusive presumption of *sanity*; it is *not* a conclusive presumption of *legal capacity to commit crime.*" (Italics in original.) This distinction, too, should be within the ken of every practitioner at the criminal bar.[4]

---

[4]On the other hand, we acknowledge that counsel's confusion in this case illustrates the practical problems that frequently arise in the operation of California's system of bifurcated guilt and sanity trials. As a

In *Ibarra* we quoted with approval from *Brubaker* v. *Dickson* (9th Cir. 1962) 310 F.2d 30, a decision particularly relevant here. *Brubaker* ordered a hearing on a petition for habeas corpus alleging, inter alia, that the defendant's counsel had failed to discover the evidence of his mental abnormality and present a defense of diminished capacity to a charge of murder. The federal appellate court acknowledged that the constitutional right to effective representation ''does not mean that trial counsel's every mistake in judgment, error in trial strategy, or misconception of law would deprive an accused of a constitutional right. Due process does not require 'errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance.' Determining whether the demands of due process were met in such a case as this requires a decision as to whether 'upon the whole course of the proceedings,' and in all the attending circumstances, there was a denial of fundamental fairness; it is inevitably a question of judgment and degree.'' (Fns. omitted.) (*Id.* at p. 37.) Upon an examination of the record, the court concluded that the facts alleged ''precluded the presentation of his available defenses to the court and the jury through no fault of his

result, there is a not inconsiderable movement to abandon that system and permit all relevant testimony on the defendant's mental state to be introduced in one proceeding. (See Louisell and Hazard, *Insanity as a Defense: The Bifurcated Trial* (1961) 49 Cal.L.Rev. 805.) As early as 1949, the Governor's Special Crime Study Commission on Criminal Law and Procedure recommended in its majority report ''that when a defense of insanity is to be interposed a plea of not guilty by reason of insanity should be entered and if a plea of not guilty is entered also, the two issues should be tried simultaneously—with separate verdicts required'' and ''that such a procedure would bring about speedier trials and more just verdicts.'' (Final Report, p. 117.) Again, in 1962, the Governor's Special Commissions on Insanity and Criminal Offenders recommended that the ''split trial'' be eliminated and Penal Code section 1026, which authorizes it, be repealed: expressing ''serious doubts'' whether the reasons given for the separate sanity trial were sound when it was adopted in 1927, the First Report stated that ''In any event, we think they are unsound today. The hope that the split trial would simplify the issues at trial on the not guilty plea was destroyed by the *Wells* and the *Gorshen* cases. Under the rule of these cases, evidence of defendant's mental condition is, if relevant, admissible at the trial of the issue of his guilt. Moreover, much the same evidence may have to be admitted at the second trial. These complications are increased by the fact that rulings on the admissibility of evidence become highly artificial and difficult to make. In short, the split trial is no longer serving a useful purpose, and we think it should be abandoned.'' (*Id.*, at p. 30; see also p. 56.)

The foregoing recommendations, however, have not as yet persuaded the Legislature to act. Although some members of this court have growing doubts of the value of our present system of separate guilt and sanity trials, the decision to modify or abolish that system remains a legislative prerogative.

own, and thus rendered his trial fundamentally unfair. Appellant does not complain that after investigation and research trial counsel made decisions of tactics and strategy injurious to appellant's cause; the allegation is rather that trial counsel failed to prepare, and that appellant's defense was withheld not through deliberate though faulty judgment, but in default of knowledge that reasonable inquiry would have produced, and hence in default of any judgment at all. The omissions alleged by appellant 'were not mere mistakes of counsel or errors in the course of the trial. If true, they constituted a total failure to present the cause of the accused in any fundamental respect. Such a proceeding would not constitute for the accused the fair trial contemplated by the due process clause. . . .' '' (Fns. omitted.) (*Id.* at pp. 38-39.)

If the allegations in *Brubaker* constituted a prima facie case of denial of effective representation, a showing of such denial has *a fortiori* been made in the case at bar. In *Brubaker* it was alleged that because of inadequate investigation counsel "failed to discover" the evidence of the defendant's abnormality; here, the record demonstrates that counsel actually possessed substantial credible evidence to warrant presenting a diminished capacity defense. In *Brubaker* the appellate court was unwilling to speculate whether counsel's inaction might have been a judgment decision, and the cause was remanded for an evidentiary hearing; here it clearly appears from the record before us that counsel did not act because he misunderstood the fundamental rule permitting the introduction of such evidence of mental abnormality in the guilt phase of the trial.

The distinction is well illustrated by two decisions handed down on the same day by the same division of the Court of Appeal. In *People* v. *Glover* (1967) 257 Cal.App.2d 502, 506-509 [65 Cal.Rptr. 219], a prosecution for battery upon a peace officer, the court reviewed "the tactical position in which appellant's counsel found himself." The final conclusions of the court-appointed psychiatrists had been adverse to a finding of diminished capacity; counsel had in his possession a prior judicial determination of his client's insanity, but that document was not admissible until the sanity phase; and in cross-examination of prosecution witnesses counsel had developed an affirmative defense of provocation, which although legally tenable was factually inconsistent with a theory of diminished capacity. The Court of Appeal concluded, "Under these circumstances, it seems to us that the failure of appel-

lant's counsel to raise the diminished capacity defense during the guilt phase of the trial and to reserve it instead exclusively for the insanity phase of the trial, was in all probability a sound tactical decision and, as such, beyond the reach of *Ibarra.*''

By contrast, in *People* v. *Welborn* (1967) 257 Cal.App.2d 513 [65 Cal.Rptr. 8], a prosecution for murder, no such justification of counsel's conduct appeared. Prior to trial, two of the three court-appointed psychiatrists had filed reports disclosing substantial evidence of the defendant's impaired ability, by reason of mental disorder, to premeditate, deliberate, and harbor malice aforethought. On the guilt phase, however, defense counsel neither sought to introduce these reports by stipulation nor called the doctors to testify in his client's behalf; indeed, no defense whatever was offered, the matter being submitted on the transcript of the preliminary hearing and a statement by the defendant to the police.

Reviewing the record, the Court of Appeal determined that the foregoing evidence of mental abnormality constituted a ''crucial defense'' within the meaning of *Ibarra,* bearing both on the issue of premeditation and deliberation and on the issue of malice aforethought. The court then reasoned (*id.* at pp. 522-523), ''The record in this case shows unmistakably that defense counsel's failure to raise the defense of diminished capacity was the result of ignorance of the law, not trial tactics. . . . The psychiatric reports available to counsel before the trial began pointed to the strong possibility of an abnormal mental condition in this case; yet defense counsel took the initiative in stipulating that the case be submitted on the transcript of the preliminary hearing without reference to the psychiatric reports. The fact that defense counsel again took the initiative in stipulating that the sanity phase of the trial be submitted on the reports of the psychiatrists indicates that *counsel probably thought that the reports were relevant only to the sanity issue.*'' (Italics added.) (Fn. omitted.) Reversing the judgment of conviction, the court concluded (at pp. 515-516) that ''the failure of defense counsel to offer in evidence at the guilt phase of the trial psychiatric evidence that the record shows was available, while at the same time neither offering nor arguing any other defense, resulted in a total failure to present the cause of the defendant in any fundamental respect, and thereby deprived him of his constitutional right to effective aid of counsel.''

█ In the case before us counsel's misunderstanding of this basic rule likewise deprived defendant of a meaningful

exercise of professional judgment, and hence effective representation. It resulted in "withdrawing a crucial defense from the case," and "thereby reduced his trial to a farce and a sham." (*People* v. *Ibarra* (1963) *supra,* 60 Cal.2d 460, 464, 466.) In such circumstances we may not save the judgment by speculating whether the defense would have been successful; regardless of the apparent strength of the prosecution's evidence, a trial in which only one side of the case is heard is "fundamentally unfair" and hence constitutes a denial of due process of law. (*Brubaker* v. *Dickson* (9th Cir. 1962) *supra,* 310 F.2d 30, 38-39.) Such a conviction cannot stand.

The judgment is reversed.

Traynor, C. J., McComb. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.