[Crim. No. 8495. First Dist., Div. One. Dec. 7, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
ADONAI BARAHONA CORTEZ, Defendant and Appellant.

**COUNSEL**

Ronald Ruiz for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Gary Garfinkle, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SIMS, J.**—Defendant has appealed from the denial of his motion to vacate a judgment under which he was convicted and sentenced for burglary in the second degree following his plea of guilty, and from the denial of his motion to vacate that plea. He contends that he was denied the effective assistance of counsel because his attorney, in recommending the guilty plea, failed to consider the defense of diminished capacity. It is concluded from an examination of the entire record that the trial court erred in denying the defendant's motions and that the orders should be reversed.

On May 29, 1967, a little after 1 a.m., the complaining witness, who had dozed off in her living room watching television, awoke to find the door of her apartment open. She closed and locked the door, went through her kitchen into her bedroom, and discovered under her bed a man whom she identified at the preliminary hearing as the defendant. She screamed and ran out of her apartment, and he fled behind her. Some time later while she was waiting for her boy friend, she saw the same man standing outside of her window exposing himself. When she opened the door to tell him to go away, he started to come toward the screen door. She shut the door real fast and screamed. A neighbor ran after the offender.

Following a preliminary examination, which brought out the foregoing facts, the defendant was held to answer a charge of burglary (Pen. Code, § 459), but a second count of assault with intent to commit rape (Pen. Code, § 220) was dismissed by the magistrate. Nevertheless, an information was filed charging the defendant with both offenses. According to a letter from defendant's attorney, which was received in evidence at the hearing on the motions, the defendant's motion to dismiss the second count for lack of probable cause (Pen. Code, § 995) was denied. The defendant entered pleas of not guilty, and not guilty by reason of insanity. The re-

port of one of the examining psychiatrists (see Pen. Code, § 1027), which is part of the record of the hearing on the motions, concluded, "He can probably cooperate with his attorney in his own defense . . . in my opinion the subject is legally sane now and was legally sane at the time of the offense."

Thereafter, the defendant entered his plea of guilty to burglary in the second degree, proceedings were suspended, and on October 6, 1967 the defendant was committed to Atascadero State Hospital for observation as a mentally disordered sex offender. A report dated December 12, 1967 concluded that the defendant was a mentally disordered sex offender, but that he was not amenable to treatment in a hospital setting. The defendant was returned to court and sentenced on January 26, 1968.

The motions under review were filed July 1, 1969, together with the declaration of defendant's present counsel, and points and authorities in support of the motions. After several continuances the motions came on for hearing. At the hearing the court received in evidence a letter from the defendant's former attorney, dated September 21, 1969, the report, dated July 12, 1967, of one of the psychiatrists who examined the defendant on July 6, 1967, in connection with his insanity plea, the report dated December 12, 1967, of the superintendent and medical director of Atascadero State Hospital under which the defendant was returned to court and sentenced, and a medical report prepared in the Spanish language in August 1964, together with a translation thereof. Testimony was received from the defendant's mother, from the interpreter, who had translated the proceedings which resulted in defendant's conviction and who also had translated the interview of the defendant by the examining psychiatrist, and from the deputy district attorney who had handled the case for the prosecution.

The mother testified that her son (who was born March 27, 1934, according to the psychiatrist's report) had problems when he was a baby; that she hired the attorney who represented him in the prior proceedings; that she told the attorney that he was in grave condition until he was 4 years old, could not speak when he was 6 years of age, and had to be operated on at the age of 7 in order that he could speak; and that she furnished the attorney with a medical report concerning the defendant from the office of Social Security dated in August 1964. This report[1] as

---

[1] The translated report reads:

"1. Motor idea perceptive defect that in view of verbal intelligence, relates much more and suggests a serious cerebral organic damage. E.M. Partents 8s 1 9 an.

"2. In the berset test, captures 15% which corresponds to an inferior intelligence and A.C. I FA 80 (Norms Berryanilla) adult workers with 6% primer.

"3. Functional disturbances directed by the psycho-sexual. Emotional neurotic

translated concludes as follows: "Behaviour relates to a cerebral defective organic condition and psychosexual disturbances."

The interpreter, who translated the court proceedings and the interview by the psychiatrist, testified that the defendant could understand the translated words of the doctor's questions; that many of his answers were not responsive and indicated that the defendant did not understand the meaning of the phrases; and that it was necessary to repeat those questions. He opined that the defendant had a 6-year-old mentality.[2]

The psychiatrist's report stated that the history he received from the defendant's attorney indicated, "The defendant had been said to have had a malady since the age of birth and no talking until age seven with retardation in school, with a history of having regular work at a car wash place, but going to pieces when he drinks." The doctor noted, the facts concerning the pending charge, as set forth above, and that "He had been previously arrested for the same thing and peeping and been told to leave New York State. There was no history of hospitalization." The report continues, "When I saw the subject, he was pleasant but somewhat puzzled in manner, giving to grinning inappropriately. His story was difficult to extract from him, and he was obviously overcome by guilt." The history, taken by the doctor with the aid of the interpreter, reportedly revealed among other things that the defendant drinks beer frequently on weekends, and that he had been drinking beer on the night of the incident for which he was arrested; and that he gave irrelevant answers to probing questions about the events which resulted in the charges against him.

The doctor concluded: "This subject does show evidence of being in at least a dull normal intelligence and maybe below that, but at any rate, he does not seem to be suffering from the condition to an extent that would interfere with his ability to know the nature and quality of his act, the nature and purpose of the action against him, and the difference be-

---

problem condition of the relationship son-mother, seriously defective. Mother because of the dominant attitude towards son contributes to serious anxieties. Use of alcohol weakens behaviour control and relates to subjacent conclusions in social valuative attitude particularly when not under alcoholic influence.

"RÉSUMÉ: Behaviour relates to a cerebral defective organic condition and psychosexual disturbances."

An accompanying electroencephalogram report concludes, as translated, "There seems to be bioelectrical brain immaturity."

[2]The interpreter stated, "Well, because of my experience as a Probation Officer in other cases for a number of years I could entertain the opinion as to the capacity of Mr. Cortez. I could see in his reaction and in his answers to the doctor that he had a childlike mentality, a retarded mentality, and certainly like that of the mentality of probably that of a 6-year-old child, and still there are 6-year-old children that would be much more responsive or of more mentality than would Mr. Cortez, but that is just my opinion that he was [sic] very retarded childlike mentality."

tween right and wrong as it pertains to his offense. He can probably cooperate with his attorney in his own defense. When, however, he imbibes alcohol, the substance's toxic effect on him is to the extent that these criteria do not apply. However, he is certainly aware of this, and the intoxication is willful and, therefore, irrelevant. Consequently, in my opinion the subject is legally sane now and was legally sane at the time of the offense."

The letter from the prior attorney states, "I always found it extremely difficult to talk to Mr. Cortez and to understand him. Most of the time he would remain silent and not even answer my questions. During all this period of time Mr. Cortez's mother was very concerned about his behavior and mental condition and wanted him treated at an institution or hospital. I recall she was against him getting out free without some treatment. So being concerned with her desires and concern I confess I did not make an all out effort to obtain a not guilty verdict; and did withdraw the two not guilty pleas and entered a plea of guilty to second degree burglary. I recall that I thought at the time that he had a good chance of getting a Not Guilty verdict based on the testimony at the preliminary, but I then, as I have mentioned then began of [*sic*] thinking of ways to carry out the desires of his mother; thus the plea entered with a period of observation at Atascadero and possible treatment. Since my attention was then taken away from a not guilty verdict I did not consider the defense of diminished capacity of the defendant to commit a crime."

The prosecutor agreed with the attorney's version of the events leading to the plea and the commitment for observation, but he disputed the content of the last sentence quoted above. He testified that the defense attorney advised him of the mother's desire that her son receive medical treatment, and that he told the attorney that "the only way he could get treatment was through the Criminal Court or at least some observation, some diagnostic studies was through a plea of guilty and he could be sent to the hospital for sex offenders and then we could see which way the thing would go."

The prosecutor remembered discussing the fact of intoxication with the defense attorney who told him that the boy drank too much; and he recalled discussing the defense of diminished capacity as far as the defendant was concerned because of his prior mental condition, but he could not recall any discussion of diminished capacity because of the defendant's intoxication. He acknowledged that both sides were motivated to determine what best could be done to secure psychiatric help, some sort of treatment for the defendant. He stated that after discussing the merits of the case it was agreed that the second count would be dismissed in

return for a plea to the first count, and that the defendant would be sent to Atascadero for observation.

The defendant's mother testified that the attorney she hired for her son advised her that the defendant would be sent to the hospital for treatment. She acknowledged, however, that he had told her that her son could possibly go to state prison for the crimes of which he was accused. The interpreter stated that the defendant apparently understood the proceedings which attended his plea of guilty, and his subsequent sentencing.

The observation report from Atascadero gives the following diagnosis: "Acute brain syndrome associated with alcohol intoxication with sexual deviation (aggressive sexuality)." The medical director concluded, "In my opinion he is a mentally disordered sex offender, but he will not benefit by care or treatment in a state hospital and is a danger to the health and safety of others. . . . [¶] This patient is a mentally disordered sex offender, but he is not amenable to treatment in a hospital setting. Society still needs to be protected from him. He should be returned to the criminal court for action. We recommend that he be sentenced for the criminal act if sentencing is mandatory, or if he is charged with a felony."

The hospital case summary attached to the report sets forth the facts of the incident leading to defendant's commitment, and reveals that the defendant "gave a long history of voyeurism as a peeping tom," and that he "denied a history of violence or of actual physical aggression against the women in his arrest." It indicates that he also stated that he had been a heavy drinker for many years; and admitted performing similar actions previously while drinking. The summary indicates that the conclusion that he was not amenable to hospital treatment was not predicated upon the reasons for his commitment, nor upon prior arrests or treatment, nor upon the nursing service evaluation, nor upon his activities in connection with industrial therapy and rehabilitation, nor upon any psychological testing, nor upon the report of his therapist, nor upon his physical and mental status and behavior, but upon the fact that the defendant was unable to communicate in the English language.[3]

---

[3]The report is essentially negative under the headings which suggested the text above. Excerpts read as follows:

"(5) *Nursing Service Evaluation:* This patient is a quiet, [*sic*] but quick to show response to any given situation. There is an apparent language barrier with this patient. Since he speaks four (4) different tongues—none of which he knows all of. Mostly due to not understanding what is wanted or desired of him, shows up on his performance. He attends therapy but is unable to communicate. His industrial therapy assignment is in the patient's dining room where he does very well. He works hard on the ward. Appearance is most always neat and clean. His manners are correct and he shows very little discontent. Eating and sleeping habits appear adequate for him. . . .

## I

Proof of specific intent was required as an element of each of the crimes which the defendant was charged with committing.[4] "To support a conviction for . . . [assault with intent to commit rape], the prosecution must prove the assault and an intent on the part of the defendant to use whatever force is required to complete the sexual act against the will of the victim. [Citations.] It is the state of mind of the defendant . . . which is in issue." (*People* v. *Roth* (1964) 228 Cal.App. 2d 522, 532 [39 Cal.Rptr. 582]. See also, *People* v. *Nye* (1951) 38 Cal. 2d 34, 37 [237 P.2d 1]; *People* v. *Peckham* (1967) 249 Cal.App.2d 941, 944 [57 Cal.Rptr. 922]; *People* v. *Peckham* (1965) 232 Cal.App.2d 163, 167 [42 Cal.Rptr. 673]; *People* v. *Padilla* (1962) 210 Cal.App. 2d 541, 543 [26 Cal.Rptr. 765]; and *People* v. *Mullen* (1941) 45 Cal. App.2d 297, 299-300 [114 P.2d 11].) It is not necessary to prove that the offender indicated a resolve to use all of his force to commit rape notwithstanding all possible resistance. (Cf. *People* v. *Mullen, supra,* 45 Cal.App.2d at p. 301, with *People* v. *Hood* (1962) 199 Cal.App.2d 44, 46 [18 Cal.Rptr. 351].) Nevertheless, a distinction is recognized between the intent to rape, and lewdness, indecency and lasciviousness either alone or accompanied by an intent to seduce. (Cf. *People* v. *Mullen, supra,* and *People* v. *Nye, supra,* 38 Cal.2d at p. 38.)

---

"(9) *Therapist Report:* The patient has attended group regularly since admission but has not been able to become involved because of the language barrier.

"(10) *Summary of Physical and Mental Status and Behavior:*

a. *Mental Picture and Attitude on Admission:* Upon admittance patient was shy and withdrawn but friendly and cooperative in the interview. He was apparently embarrassed at several points when discussing sexual acts. Patient appeared calm and composed throughout most of the interview. Apparently fully oriented, memory is apparently intact.

b. *Treatment Program:* Group therapy, milieu therapy and industrial therapy.

c. *Patient's response to treatment program, including changes in mental status and attitude:* There has been no significant change.

d. *Physical Factors:* None significant.

e. *Behavioral Incidents During Past Year:* None. . . .

"(12) *Staff Findings:* The patient was interviewed by using a Spanish speaking interpretor [*sic*]. The patient was alert, responsive and there was no evidence of psychotic symptomatology. He admits to similar actions previously while drinking. It is apparent that he has had little formal education, and he has functioned at a marginal level throughout his life. With his marked communication problems and his limited assets, I do not see him as suitable for hospital treatment."

[4]The question of the sufficiency of the evidence to support proof of such intent is not involved in this appeal, although it was raised in connection with the second count prior to defendant's plea to the first count, and the dismissal of the former. (Cf. *People* v. *Bard* (1968) 70 Cal.2d 3, 5-6 [73 Cal.Rptr. 547, 447 P.2d 939], and *People* v. *Elder* (1969) 274 Cal.App.2d 381, 398-401 [79 Cal.Rptr. 466], with *People* v. *Tidmore* (1963) 218 Cal.App.2d 716, 720 [32 Cal.Rptr. 444], and *People* v. *Mullen* (1941) 45 Cal.App.2d 297, 300-301 [114 P.2d 11].)

Similar considerations govern the offense of burglary (Pen. Code, § 459) when, as here, the felonious intent is claimed to be the intent to commit rape. (See, *People* v. *Failla* (1966) 64 Cal.2d 560, 564-566 [51 Cal.Rptr. 103, 414 P.2d 39]; and *People* v. *Tidmore* (1963) 218 Cal. App.2d 716, 720 [32 Cal.Rptr. 444].) ■ If the entry was effected with the intent "to commit one or more misdemeanors (e.g., indecent exposure or battery) or acts which are not crimes (e.g., masturbation)" (*People* v. *Failla, supra,* 64 Cal.2d at p. 565), or with the intent to seduce the victim (*People* v. *Tidmore, supra,* 218 Cal.App.2d at p. 720), no burglary was committed.

■ Moreover, ". . . whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act." (Pen. Code, § 22. See, *People* v. *Townsend* (1969) 269 Cal.App.2d 430, 432-433 [74 Cal.Rptr. 758]; and *People* v. *Peckham, supra,* 232 Cal.App.2d 163, 168.)

■ Additionally the following rule should be noted, "It has long been settled that evidence of diminished mental capacity, whether caused by intoxication, trauma, or disease, can be used to show that a defendant did not have a specific mental state essential to an offense." (*People* v. *Conley* (1966) 64 Cal.2d 310, 316 [49 Cal.Rptr. 815, 411 P.2d 911].)

## II

It is obvious that each of the foregoing principles had a bearing on the legal conclusions to be adduced from the facts giving rise to the charges against the defendant, and from the facts concerning his background. ■ "The constitutional right to the assistance of counsel in a criminal case [citations] includes the guarantee that such assistance be 'effective.' [Citations.] That 'effective' counsel required by due process, however, is not *errorless* counsel; rather, it is counsel 'reasonably likely to render, *and rendering* reasonably effective assistance.' [Citations.]" (*In re Saunders* (1970) 2 Cal.3d 1033, 1041 [88 Cal.Rptr. 633, 472 P.2d 921]. See also, *Von Moltke* v. *Gillies* (1948) 332 U.S. 708, 721 [92 L. Ed. 309, 319, 68 S.Ct. 316]; *In re Williams* (1969) 1 Cal.3d 168, 174-176 [81 Cal.Rptr. 784, 460 P.2d 984]; *People* v. *McDowell* (1968) 69 Cal. 2d 737, 746 and 748-749 [73 Cal.Rptr. 1, 447 P.2d 97]; *In re Hawley* (1967) 67 Cal.2d 824, 827-828 [63 Cal.Rptr. 831, 433 P.2d 919]; *People* v. *Gayton* (1970) 10 Cal.App.3d 178, 182 [88 Cal.Rptr. 891]; *People* v. *Cline* (1969) 2 Cal.App.3d 989, 998 [83 Cal.Rptr. 246]; *Peo-*

*ple* v. *Welborn* (1967) 257 Cal.App.2d 513, 518-519 [65 Cal.Rptr. 8]; *People* v. *Pineda* (1967) 253 Cal.App.2d 443, 465-473 [62 Cal.Rptr. 144] cert. den. 390 U.S. 984 [19 L.Ed.2d 1284, 88 S.Ct. 1108]; and *Brubaker* v. *Dickson* (9th Cir. 1962) 310 F.2d 30, 38-40.)

█ The failure to present the defense of diminished capacity is the withdrawal of a crucial defense within the foregoing principles whether it is occasioned by ignorance of counsel (see, *People* v. *McDowell, supra,* 69 Cal.2d 737, 746-751; and *People* v. *Welborn, supra,* 257 Cal.App.2d 513, 519-523), or by lack of preparation and investigation (see, *In re Saunders, supra,* 2 Cal.3d 1033, 1049; and *Brubaker* v. *Dickson, supra,* 310 F.2d 30, 39). █ Moreover, it is clear that defendant may attack the ineffectiveness of counsel in connection with the entry of his plea, as well as in connection with a trial on the merits, "Prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered." (*Von Moltke* v. *Gillies, supra,* 332 U.S. 708, 721. See also, *In re Williams, supra,* 1 Cal. 3d 168, 175; and cf. *Brady* v. *United States* (1970) 397 U.S. 742, 758 [25 L.Ed.2d 747, 761, 90 S.Ct. 1463]; *McMann* v. *Richardson* (1970) 397 U.S. 759, 773-774 [25 L.Ed.2d 763, 774-775, 90 S.Ct. 1441]; *In re Hawley, supra,* 67 Cal.2d 824, 828-830; *In re Beaty* (1966) 64 Cal.2d 760, 764-765 [51 Cal.Rptr. 521, 414 P.2d 817]; *In re Rose* (1965) 62 Cal.2d 384, 389-390 [42 Cal.Rptr. 236, 398 P.2d 428]; and *People* v. *Connor* (1969) 270 Cal.App.2d 630, 637-639 [75 Cal.Rptr. 905].)

There are two factors which preclude granting relief to the defendant for the alleged ineffectiveness of his counsel in this proceeding. █ In the first place, procedurally, as appears from the precedents cited above, such an attack should be made by appeal, or, where warranted, by application for a writ of habeas corpus. "The appellant must show that the *facts* on which he relies were unknown to him and were not reasonably discoverable with due diligence at any time earlier than the time of his petition for *coram nobis.* [Citations.]" (*People* v. *Connor, supra,* 270 Cal.App.2d 630, 635. See also, *People* v. *Clinton* (1966) 243 Cal.App.2d 284, 288 [52 Cal.Rptr. 221].) █ "Any complaints he has relating to lack of time with which to confer with counsel, or to counsel's lack of diligence or competence are predicated on matters which arose before judgment and cannot be raised collaterally in these proceedings. [Citations.]" (*People* v. *Williams* (1965) 238 Cal.App.2d 585, 591 [48 Cal.Rptr. 67].) If the trial court had no jurisdiction to entertain the motion to vacate on the grounds presented, the appeal should be dismissed. (See, *People* v. *Clinton, supra,* 243 Cal.App.2d 284, 288.)

It has been suggested, however, that an appeal from the denial of a petition for a writ of *coram nobis,* which fails to set forth grounds upon which the judgment can be vacated in the lower court, may be treated as a petition for a writ of habeas corpus in the appellate court. (*People* v. *Connor, supra,* 270 Cal.App.2d 630, 635.) In *People* v. *Enriquez* (1967) 65 Cal.2d 746 [56 Cal.Rptr. 334, 423 P.2d 262], the court stated, "It matters not whether this petition be treated as a petition for habeas corpus or one in *coram nobis.* If *coram nobis,* the case is on appeal, and if it be treated as habeas corpus section 1484 of the Penal Code provides that on habeas corpus the court hearing the case 'must thereupon proceed . . . to dispose of such party as the justice of the case may require, . . .' " (65 Cal.2d at p. 750.)

In *People* v. *Williams, supra,* 238 Cal.App.2d 585, this court concluded that it could not treat the appeal from the denial of motion to vacate as an application for a writ of habeas corpus because of a lack of jurisdictional basis on which to act. (238 Cal.App.2d at pp. 595-596; and see, *People* v. *Buccheri* (1969) 2 Cal.App.3d 842, 845 [83 Cal.Rptr. 221]; and *People* v. *Phillips* (1968) 263 Cal.App.2d 423, 429 [69 Cal.Rptr. 675].)[5] It is unnecessary to resolve the possible conflict between the foregoing precedents, or to determine the effect of the noted constitutional and statutory charges. Even if it be assumed, as was ordered at the termination of the hearing below, that the defendant was confined within this appellate district at the Reception-Guidance Center, Vacaville, at the time of his appeal, and that this court may transmute the appeal into an applica-

---

[5]Former section 4b of article VI of the California Constitution provided in part that the District Courts of Appeal "shall . . . have power to issue writs of . . . habeas corpus. . . . Each of the justices thereof shall have power to issue writs of habeas corpus to any part of his appellate district upon petition by or on behalf of any person held in actual custody, and may make such writs returnable before himself or the district court of appeal of his district, or before any superior court within his district, or before any judge thereof."

On November 8, 1966 the foregoing section was repealed and the following provisions embodied in section 10 of article VI were adopted: "The . . . courts of appeal . . . have original jurisdiction in habeas corpus proceedings."

At the same time (Stats. 1966. First Ex. Sess., ch. 161, § 33, p. 720) the following provisions, enacted as section 69109 of the Government Code (*id.* § 22, p. 717) became operative: "Each of the justices of the courts of appeal shall have power to issue writs of habeas corpus to any part of his appellate district upon petition by or on behalf of any person held in actual custody, and may make such writs returnable before himself or the court of appeal of his district, or before any superior court within his district, or before any judge thereof."

The foregoing provisions were repealed effective November 10, 1969 (Stats. 1969, ch. 39, § 2, p. 145), and the following provisions, now found in section 1508 of the Penal Code were enacted (*id.,* § 3): ". . . (b) A writ of habeas corpus issued by a court of appeal or a judge thereof may be made returnable before the issuing judge or his court or before any superior court or judge thereof located in that appellate district."

tion for a writ, the record lacks factual substance for relief on the grounds asserted.

The attorney wrote, "Since my attention was then taken away from a not guilty verdict I did not consider the defense of diminished capacity of the defendant to commit a crime." On the other hand, the testimony of the prosecutor indicates that the defendant's prior mental condition and his drinking were reviewed. The deputy district attorney testified that the defense of diminished capacity was discussed. He did limit his recollection of the discussion to the effect of the defendant's prior mental condition, as distinguished from any intoxication, but that fact hardly serves to show that the defense was not considered at all.

 "To justify relief on the ground of constitutionally inadequate representation of counsel ' "an extreme case must be disclosed" [citations.]. It must appear that counsel's lack of diligence or competence reduced the trial to a "farce or a sham." [Citations.]' (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 . . .) Defendant has the burden, moreover, of establishing his allegation of inadequate representation 'not as a matter of speculation but as a demonstrable reality.' (*Adams* v. *United States* ex rel. *McCann* (1942) 317 U.S. 269, 281 . . .; accord, *People* v. *Robillard* (1960) *supra,* 55 Cal.2d 88, 97 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].)" (*People* v. *Reeves* (1966) 64 Cal.2d 766, 774 [51 Cal.Rptr. 691, 415 P.2d 35], cert. den. 385 U.S. 952 [17 L.Ed.2d 229, 87 S.Ct. 332].)

 If the prosecutor is disbelieved, the defendant has established not that his attorney was ignorant of the defense of diminished capacity, but that he did not consider, or overlooked, it. He has not established that if the defense had in fact been considered the plea bargain would have been rejected, and the case would have been contested. The difficulties of retrospectively examining the motivation and causation for the entry of a plea which apparently was entered voluntarily has been examined in three recent cases.

In *Brady* v. *United States, supra,* it was contended that a plea was entered to a charge of kidnaping because of fear of the invocation of a provision of law authorizing the death penalty if the case was contested by jury trial—a provision subsequently ruled unconstitutional. The court reviewed the factors which lead to the entry of a guilty plea.[6] It concluded,

---

[6]The opinion states: "The issue we deal with is inherent in the criminal law and its administration because guilty pleas are not constitutionally forbidden, because the criminal law characteristically extends to judge or jury a range of choice in setting the sentence in individual cases, and because both the State and the defendant often find it advantageous to preclude the possibility of the maximum penalty authorized

". . . we cannot hold that it is unconstitutional for the State to extend a benefit to a defendant who in turn extends a substantial benefit to the State and who demonstrates by his plea that he is ready and willing to admit his crime and to enter the correctional system in a frame of mind which affords hope for success in rehabilitation over a shorter period of time than might otherwise be necessary." (397 U.S. 753 [25 L.Ed.2d at p. 759].)

The difficulties of reappraisal are set forth at length.[7] The opinion concluded, "We find no requirement in the Constitution that a defendant must be permitted to disown his solemn admissions in open court that he committed the act upon which he is charged *simply* because it later develops that the State would have had a weaker case than the defendant had *thought* or that the maximum penalty then assumed applicable has been held inapplicable in subsequent judicial decisions." (397 U.S. 757 [25 L.Ed.2d at p. 761], italics added.)

In *McMann* v. *Richardson, supra,* the court recognized the problem which is presented by this case, as follows: "On the one hand, uncertainty is inherent in predicting court decisions; but on the other hand defendants facing felony charges are entitled to the effective assistance of competent counsel." (397 U.S. at p. 771 [25 L.Ed.2d at p. 773], fn. omitted.) With respect to the question of whether mistaken reliance on the admissibility

---

by law. For a defendant who sees slight possibility of acquittal, the advantages of pleading guilty and limiting the probable penalty are obvious—his exposure is reduced, the correctional processes can begin immediately, and the practical burdens of a trial are eliminated. For the State there are also advantages—the more promptly imposed punishment after an admission of guilt may more effectively attain the objectives of punishment; and with the avoidance of trial, scarce judicial and prosecutorial resources are conserved for those cases in which there is a substantial issue of the defendant's guilt or in which there is substantial doubt that the State can sustain its burden of proof. It is this mutuality of advantage which perhaps explains the fact that at present well over three-fourths of the criminal convictions in this country rest on pleas of guilty, a great many of them no doubt motivated at least in part by the hope or assurance of a lesser penalty than might be imposed if there were a guilty verdict after a trial to judge or jury." (397 U.S. at pp. 751-754 [25 L.Ed.2d at pp. 758-759], fns. omitted.)

[7]The opinion states: "Often the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted. Considerations like these frequently present imponderable questions for which there are no certain answers; judgments may be made which in the light of later events seem improvident, although they were perfectly sensible at the time. The rule that a plea must be intelligently made to be valid does not require that a plea be vulnerable to later attack if the defendant did not correctly assess every relevant factor entering into his decision. A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action." (397 U.S. at pp. 756-757 [25 L.Ed.2d at p. 761]; and see *McMann* v. *Richardson, supra,* 397 U.S. 759, 769-771 [25 L.Ed.2d 763, 772-773].)

of a confession should enable the defendant to avoid the plea because the plea might otherwise not have been entered, the court concluded, "But because of inherent uncertainty in guilty plea advice, this is a highly speculative matter in any particular case and not an issue promising a meaningful and productive evidentiary hearing long after entry of the guilty plea." (397 U.S. at p. 774 [25 L.Ed.2d at p. 775].)

In *People* v. *Connor, supra,* 270 Cal.App.2d 630 it was contended that the plea should be set aside because the defendant's counsel did not realize that he had a *Miranda* objection to a confession. The former attorney went further than the record in this case. He stated, ". . . he was unaware of the *Miranda* decision at the time he so advised his client and that had he been so aware '. . . I believe I would not have advised the defendant to plead guilty in the first degree murder, but on the contrary, would have advised him to stand trial. . . .' " (270 Cal.App.2d at p. 636.) The court stated, "We are not bound to accept the opinions of the attorney as to what he probably would have done under circumstances presented over a year before as set forth in his affidavit. Ignorance of the *Miranda* decision may not have been the deciding factor in the light of evidence known to both prosecution and to the defense." (*Id.,* at p. 638, fns. omitted.)

It is concluded that defendant, if entitled to review in these proceedings, has failed to carry the burden of proving that his plea was entered because of the ineffectiveness of his counsel. (See, in addition to precedents discussed above, *In re Hawley, supra,* 67 Cal.2d 824, 828-830; *People* v. *Hines* (1967) 66 Cal.2d 348, 357 [57 Cal.Rptr. 757, 425 P.2d 557]; *People* v. *Enriquez, supra,* 65 Cal.2d 746, 747-748; *In re Beaty, supra,* 64 Cal.2d 760, 764-765; and *In re Rose, supra,* 62 Cal.2d 384, 386 and 390-391.)

### III

▮ Nevertheless, the record reveals uncontradicted facts which demonstrate that the defendant is entitled to the relief which he seeks. Here the district attorney unequivocally told the defendant, through his attorney, that "the only way he could get treatment was through the criminal court . . . through a plea of guilty." This statement is obviously incorrect because he could have been referred as a mentally disordered sex offender under the provisions then found in former section 5500 et seq. (present § 6300 et seq.) of the Welfare and Institutions Code whether he was convicted of a felony or a misdemeanor. He also might have been referred without a criminal conviction under the provisions of former section 5700 et seq. (present § 6450 et seq.) as a mentally abnormal sex offender. More importantly it is clear from the record that both the district attorney,

the defendant's attorney, and the defendant and his mother all believed that the ordinary procedures of diagnosis and treatment would be available to defendant. The report from the hospital (see fn. 3 above) clearly reflects that such was not the case because of the defendant's inability to communicate in the English language. It is unnecessary to determine whether it is a denial of equal protection to deny non-English speaking defendants the opportunities for treatment and rehabilitation granted others. (Cf. *Castro* v. *State of California* (1970) 2 Cal.3d 223, 243 [85 Cal.Rptr. 20, 466 P.2d 244].) The failure to afford the promised diagnosis and treatment necessitates setting aside the judgment and plea.

In *People* v. *Wadkins* (1965) 63 Cal.2d 110 [54 Cal.Rptr. 173, 403 P.2d 429], the court noted: ". . . there is ample authority for the proposition that one who has pleaded guilty in reliance on the unkept promises of reliable public officials should be allowed to withdraw that plea, even after judgment has been pronounced. This is particularly true where, as here, the judgment as pronounced is alleged to be contrary to the promise which gave rise to the guilty plea." (63 Cal.2d at p. 113. See also, *People* v. *Delles* (1968) 69 Cal.2d 906, 910-911 [73 Cal.Rptr. 389, 447 P.2d 629]; and *People* v. *Schwarz* (1927) 201 Cal. 309, 314 [267 P. 71]; and cf. *People* v *Hines, supra,* 66 Cal.2d 348, 357-358; *People* v. *Reeves, supra,* 64 Cal.2d 766, 776-777.)

In *People* v. *Hakeem* (1969) 268 Cal.App.2d 877 [74 Cal.Rptr. 511], cert. den. 396 U.S. 913 [24 L.Ed.2d 189, 90 S.Ct. 231], and *People* v. *Phillips, supra,* 263 Cal.App.2d 423, promises to refer for treatment for drug addiction under the Narcotic Rehabilitation Act were involved. In each case the court found that the promise to refer had been performed, and that the defendant could not avoid his plea because he was subsequently rejected for treatment after observation and treatment. (See, 268 Cal.App.2d at pp. 880-881, and 263 Cal.App.2d at p. 427.) On the other hand, this court in *People* v. *Coley* (1968) 257 Cal.App.2d 787 [65 Cal.Rptr. 559] (disapproved on another point in *People* v. *Delles, supra,* 69 Cal.2d 906, 909-910) held that it was error to deny the defendant's motion to change his plea where it was expressly represented and agreed that the defendant would receive such treatment, and he in fact was rejected and returned for sentencing. We concluded, "The plea was given and received because of mistaken belief on the part of all concerned that defendant was eligible for the program. Under these circumstances the court abused its discretion in refusing to permit the defendant to withdraw his plea of guilty." (257 Cal.App.2d at p. 804.) Similar considerations govern in this case where no one appreciated that the defendant's language barrier would preclude routine diagnosis and treatment.

It is noted that in *Coley* the matter was promptly brought to the court's attention at sentencing. (See, 257 Cal.App.2d at pp. 799-800.) In *Hakeem* and *Phillips* each courts observed that the defendant failed to move to change his plea at the time of sentencing. (See, 268 Cal.App.2d at p. 880, and 263 Cal.App.2d at p. 428.) ▋ Here the defendant delayed for almost a year and one-half before attempting to set aside the judgment and change his plea. The delay is explained by his former counsel's failure to press any defense on the merits, the mental capabilities of the defendant, and the language difficulties of the defendant and his mother. When these factors are placed in the balance with the facts in the record which reflect that the defendant may have a good defense to the charges, or, at least, that he may have only been guilty of a lesser offense, it appears an abuse of discretion to deny consideration of his motion, or to deny it, having considered it. ▋ If the interests of society require that defendant be committed because he is dangerous to the health and safety of others (see, Welf. & Inst. Code, §§ 6300 and 6450) it should be fairly determined whether he be so committed as a felon, or as a misdemeanant, or under a purely civil commitment.

The order is reversed and the case is remanded with instructions to the trial court to set aside the judgment and plea of the defendant, and reinstate the first count of the indictment, and to rearraign him for plea to the charges originally set forth in the indictment.

Molinari, P. J., and Elkington, J., concurred.