[Crim. No. 567.   Fifth Dist.   Jan. 29, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. GERALD
ROBERT HENLEY, Defendant and Appellant.

Allan B. O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Hawes and John Fourt, Deputy Attorneys General, for Plaintiff and Respondent.

GARGANO, J.—Appellant was convicted of two separate offenses of grand theft from the person in violation of subparagraph 2 of section 487 of the Penal Code. He was also charged with and admitted three prior felony convictions, two for robbery and one for burglary. Appellant's application for probation was denied, and he was sentenced to state prison for the term prescribed by law on each offense, the sentences to run consecutively. This appeal followed.

The thefts for which appellant was convicted and which were specifically charged in the information were from the persons of Dudly K. Colclough and Henry R. Bonetti. However, during the trial respondent also offered evidence that appellant had committed two similar thefts (not charged in the information) from the persons of Myuda Osaka and Martin Agema. Thus, to avoid confusion, the crimes for which appellant was convicted will be referred to as the Colclough and Bonetti thefts, and the crimes which appellant allegedly committed against Osaka and Agema will be referred to as the Osaka and Agema thefts.

### The Colclough and Bonetti Thefts

Dudly K. Colclough, age 85, was on Fairfield Road in North Sacramento at about 4:30 p.m. on February 18, 1967, when appellant walked by and mentioned something about his (appellant's) hat. Appellant stopped, returned to where Colclough was standing and asked where the girls were. Mr. Colclough answered, "Well, I don't know what you mean." Appellant stated, "Well, I haven't been here or around here a long time" and "I want to see the girls." Then appellant grabbed at Mr. Colclough's left thigh saying, "This is the way we do it." Colclough walked about two blocks when he noticed that his wallet was missing from the back pocket of

his pants. Realizing that appellant must have picked his pocket, Colclough reported the theft to the police.

At about 7:30 p.m. of the same day Henry R. Bonetti, who was driving to Sparks, Nevada, became confused as to the route so he entered the A & J Club on Stockton Boulevard in Sacramento to have a drink and to seek directions; appellant was seated at the bar and Bonetti took a seat next to him. Later Bonetti paid for his drink with a $20 bill which he removed from a wallet containing $281. Then he walked out of the bar to his car.

While Bonetti was engaged in unlocking the car door, appellant approached and tapped him on the shoulder. Appellant said he had four quarters and asked Bonetti to gamble them in the slot machines at Sparks, Nevada. Bonetti answered that there would be no advantage in doing so unless appellant were present. Appellant stated, ''Well, give them to somebody—give them to one of the girls.'' Appellant then tapped Bonetti on the hip just below the rear pocket, causing the wallet to become dislodged. Appellant grabbed the wallet with his other hand and left.

Bonetti did not realize that his wallet had been taken until he entered his car. He jumped out of the car and followed appellant, who by then had disappeared around the corner of a building. As Bonetti came around the corner of the building he saw appellant on the passenger side of what he described as a two-toned green and white, or blue and white, 1954. 1955 or 1956 model Buick or Oldsmobile. The automobile left the scene before Bonetti could catch up with it or get the license number. Bonetti returned to the bar and reported the theft to the bartender and later to the police.

### The Osaka and Agema Thefts

Myuda Osaka, age 86, was standing on Third Street in Sacramento between I and J Streets at about 1:30 p.m. on February 28, 1967, when appellant approached and offered him a cigar. Appellant then put his arm around Osaka, grabbed Osaka's wallet containing $145 and ran to a car. Osaka could not make out the entire license plate but he could see that the numbers were 662.

Martin Agema, age 80, was standing on 12th Street between E and F Streets in the City of Sacramento on February 4, 1967. Appellant approached, told Agema that he was celebrating and offered him a cigar. Then appellant pushed Agema against a store window and took $175 from his pocket.

## Appellant's Contentions

Appellant does not contend or even suggest that the evidence is insufficient to sustain his conviction. However, he presents three arguments for reversal: That during the trial errors in law occurred which resulted in a miscarriage of justice; that he did not receive constitutionally adequate representation by his trial counsel; that the lineup procedure tainted his in-court identification and deprived him of due process.

### I—Errors During Trial

We will deal first with the alleged errors during trial. These are (1) that the trial court erred in admitting evidence of alleged offenses not charged in the information, (2) that the identifications of appellant by Osaka and Agema were so uncertain that their testimony should have been rejected by the trial court, and (3) that the court erred in its instructions to the jury.

1) ■■■ Appellant concedes that under proper circumstances evidence of other crimes is admissible in a criminal prosecution; such evidence is admissible to prove a relevant or material fact other than that the accused is predisposed to commit crime (*People* v. *Lopez*, 60 Cal.2d 223, 249 [32 Cal. Rptr. 424, 384 P.2d 16]). Appellant maintains, however, that the Osaka and Agema thefts had no evidentiary value other than to show his criminal disposition. In short, while admitting that there was some similarity between the Osaka and Agema thefts and the Colclough theft, appellant denies that the similarity was sufficient to establish his identity as to the latter offense or to show a common plan, scheme and design under Evidence Code section 1101, subdivision (b) as respondent maintains. He also asserts that there was absolutely no similarity between the Osaka theft and the Bonetti theft, and that the court nevertheless admitted the evidence of the former to prove the latter.[1]

We are not persuaded by appellant's argument. On the contrary, we conclude that there were sufficient points of similarity between the Osaka and Agema thefts and the Colclough theft to establish appellant's identity as to the latter and to show a common plan, scheme and design. In each case the thief approached an elderly gentleman who was standing on a public street and who apparently was incapable of coping

[1] Osaka testified early during appellant's trial. He was called as a witness by the prosecution shortly after Mr. Bonetti testified and before Mr. Colclough was called as a witness.

with or defending against appellant's tactics; in each case the thief engaged the victim in a conversation to distract his attention, and in two cases he offered the victim a cigar; in each case the thief removed the victim's wallet from his pocket by stealth or force. Moreover, even if we should assume that Osaka's testimony was irrelevant when first admitted, as appellant maintains, it became relevant later during the trial when the prosecution introduced evidence of the Colclough theft.[2] ▮▮ It is settled that the order of proof lies within the sound discretion of the trial court and that the exercise of its discretion in this respect will not be disturbed on appeal in the absence of a palpable abuse.[3]

2) ▮▮ Appellant argues that his identification by Osaka and Agema was so uncertain that the testimony of these witnesses should have been excluded by the trial court. Mr. Osaka positively identified appellant at the trial as the man who robbed him, but it was shown on cross-examination that he had been uncertain in his identification of appellant at the preliminary hearing. Mr. Agema did not see the thief's face clearly, and his identification was based on a view of the man's neck and the back of his head. However, appellant's counsel did not object or move to strike the testimony of these witnesses on this ground and hence appellant is precluded from raising the alleged error on appeal (Evid. Code, § 353, subd. (a); Pen. Code, § 1102; *People* v. *Fontaine,* 237 Cal. App.2d 320, 329 [46 Cal.Rptr. 855]). Moreover, appellant's argument goes to the weight, not the admissibility of the testimony.

3) ▮▮ Appellant criticizes the court below for not adequately instructing the jury on the limited purpose for which they could consider the Osaka and Agema thefts. The court instructed the jury as follows:

''Evidence was offered in this case for the purpose of show-

---

[2]It is of course arguable, as respondent maintains, that there is sufficient similarity between the Osaka theft and the Bonetti theft to establish appellant's identity as to the latter and to prove a common plan, scheme and design. In each case the thief removed the wallet from the victim's person after using a ruse to distract the victim's attention. Moreover, on both occasions the appellant fled in a car which had the same license number seen by Osaka and fit the general description supplied by Bonetti.

[3]At the commencement of the trial the prosecutor, out of the presence of the jury, informed the court that he was going to offer the testimony of Osaka and Agema. Appellant's counsel made no objection that this testimony was inadmissible on the ground that the crimes were dissimilar. Thus, the court did not abuse its discretion when it admitted Osaka's testimony shortly after Mr. Bonetti testified.

ing that the defendant committed other crimes than the ones of which he is accused and for which he is on trial in this action.

"Such evidence was received for a limited purpose only; not to prove distinct offenses or continual criminality, but for such bearing, if any, as it might have on the question whether the defendant is innocent or guilty of any crime charged against him in this action.

"You are not permitted to consider that evidence for any other purpose, and as to that purpose you must weigh such evidence as you do all other in the case.

"The value, if any, of such evidence depends on whether or not it tends to show—

"(1)—the identity of the person who committed the alleged crime in question in this case, if it was committed; or

". . . . . . . . . . . . ."

"(4)—that the defendant was familiar with or possessed the means alleged to have been used in the commission of a crime of which he is accused in this action; or

". . . . . . . . . . . . ."

"(6)—that there existed in the mind of the defendant a plan, scheme, system or design, into which fitted the commission of the offenses for which he now is on trial."

(CALJIC 33, modified.)

Appellant's attack is twofold. He alleges that the instruction as modified by the court was too broad, vague and uncertain and permitted the jurors to consider the evidence of appellant's other crimes for any purposes they saw fit, including appellant's propensity to commit crime.[4] He also maintains that since the judge did not describe the other crimes referred to in the instruction, he in essence told the jury they could consider appellant's three prior felony convictions (in addition to the Osaka and Agema thefts) for the three purposes specified in the instruction.

Admittedly, the instruction which the trial judge gave to the jury in the instant case is not a model to be followed (see *People* v. *Peete,* 28 Cal.2d 306, 316-317 [169 P.2d 924]). However, it nevertheless precisely limited the purpose for which the

---

[4]Appellant argues, for example, that the trial judge made no attempt "to define to the jury what constituted a plan, scheme, system or design" even though the judge was familiar with the "many conflicting opinions of the appellate courts on the meaning" of these words. He also insists that the court wrongly told the jury that the evidence was admissible to show "that the defendant was familiar with or possessed the means alleged to have been used in the commission of a crime of which he is accused in this action."

evidence of appellant's other crimes could be considered by the jury and explained that such evidence was not admitted to show appellant's criminal disposition. In short, the instruction made it reasonably clear to the jury that evidence of the Osaka and Agema thefts was received for the sole purpose of establishing defendant's identity as the person who committed the Colclough and Bonetti thefts, that he was familiar with and had the means to commit at least two of these offenses (apparently because he used the same automobile to make his getaway), and that all four crimes were part of a common plan, scheme or design. Thus, if appellant believed that the instruction was too broad and vague, he should have tendered his own instruction containing clearer and more restrictive language. Having failed to do so, he cannot now complain on appeal (*People* v. *Warren,* 16 Cal.2d 103, 116-117 [104 P.2d 1024]).

The cases relied upon by appellant are not controlling. In *People* v. *Peete, supra,* 28 Cal.2d 306, 316-317, albeit the Supreme Court criticized a similar instruction, it did not disapprove the instruction. In *People* v. *Covert,* 249 Cal.App.2d 81, 90 [57 Cal.Rptr. 220], the trial court modified the standard jury instruction (CALJIC 33) to omit the qualification that "the value, if any, of such evidence depends on whether or not it tends to show" one or more of such elements as identity, motive, plan or design. The court therefore held that the omission of this language allowed the jury to apply the evidence of other offenses as they wished. However, the court, by implication at least, approved the giving of the complete CALJIC 33 in an appropriate case.

Appellant's argument that the instruction permitted the jury to consider his prior felony convictions for the three purposes stated in the instruction is likewise not persuasive. Significantly, the instruction does not state that defendant (appellant) was convicted of other crimes. It states that "[e]vidence was offered in this case for the purpose of showing that the defendant *committed* other crimes than the ones of which he is accused and for which he is on trial in this action." (Italics added.) It also states that "you must weigh such evidence as you do all other in the case." Thus, it should have been reasonably clear to the jury that the court was referring to the Osaka and Agema offenses and not to appellant's prior felony convictions. Moreover, the court also instructed the jury that appellant's prior felony convictions could be considered only for the purpose of determining his

credibility, and we must assume that the jury followed this admonition. ██ It is the rule that an appellate court, in determining whether error has been committed in the giving of jury instructions, must consider the instructions as a whole (*People* v. *Hess*, 104 Cal.App.2d 642, 684 [234 P.2d 65]; *People* v. *Guasti*, 110 Cal.App.2d 456, 468 [243 P.2d 59]). We must also assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given (*People* v. *Powell*, 186 Cal.App.2d 54, 59 [8 Cal.Rptr. 707]).

## II—ADEQUACY OF TRIAL COUNSEL

██ Appellant relies on *People* v. *Ibarra*, 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487], to contend that he did not receive effective representation from his trial counsel and that his trial was reduced to a farce and a sham. Specifically, appellant maintains that when his trial counsel put him on the stand to testify, counsel made it possible for the prosecutor to impeach him by showing that he had committed three prior felonies and then compounded the error by *not* giving appellant the opportunity to deny the two offenses for which he was being tried; appellant's trial counsel asked appellant to deny the Osaka and Agema thefts, but he did not ask appellant to deny either the Colclough or Bonetti thefts. Appellant therefore insists that "[t]o place an accused with such a colorful background on the stand and fail to have him deny any of the crimes charged nor assert his innocence is not merely an error in judgment, but is suicide."

We note at the outset that in *People* v. *Ibarra, supra,* 60 Cal.2d 460, defendant's trial counsel failed to assert a vital defense due to his misconception of the law; he failed to assert defendant's Fourth Amendment right to be free from an unlawful search and seizure because he was under the impression that a defendant could not assert this right if he denied possession of the narcotics involved. Likewise, in the recent case of *People* v. *McDowell*, 69 Cal.2d 737 [73 Cal.Rptr. 1, 447 P.2d 97], the defendant's trial counsel made no attempt to show defendant's diminished mental capacity as a partial defense to the murder charge under the well-settled *Wells-Gorshen* rule. (*People* v. *Wells*, 33 Cal.2d 330 [202 P.2d 53]; *People* v. *Gorshen*, 51 Cal.2d 716 [336 P.2d 492].) In each case the California Supreme Court understandably held that the failure of defense counsel to utilize a vital and clearly applicable defense deprived the defendant of his constitutional right to effective representation and reduced the trial to a

farce and a sham. However, we have found no case which has held that a mere error in judgment of trial strategy, no matter how significant it may later appear to be, is sufficient to warrant a reversal. On the contrary, it has been aptly stated that a defendant ''is entitled to a fair trial, not a perfect one.'' (*United States* ex rel. *Weber* v. *Ragen*, 176 F.2d 579, 586.) In fact, to reverse for an honest mistake or error in trial judgment would subject every conscientious lawyer who unsuccessfully defends a defendant in a criminal action to ''second guessing'' or ''Monday morning quarterbacking'' and would flood the appellate courts with unmeritorious appeals.

It is of course true that when appellant's trial counsel called him to the stand to testify he made it possible for the People to show that appellant had been convicted of three prior felonies. However, the decision as to whether an ex-felon should be called to the stand to testify on his own behalf in a criminal trial is often a difficult one and is largely dependent on the circumstances of each case. For example, in the instant case the People offered evidence to prove that appellant had committed two criminal offenses in addition to those for which he was being tried. These offenses were not charged in the information and hence were not denied by appellant's plea of ''not guilty.'' Thus, appellant's trial counsel may have justifiably felt that it was imperative for appellant to take the stand to deny the crimes even though it made it possible for the People to impeach him. Manifestly, appellant's counsel took a calculated risk and we cannot use hindsight to ''second guess'' his trial strategy.

Admittedly, counsel's failure to ask appellant to deny that he had taken any money from Colclough or Bonetti is perplexing. However, we may reasonably assume that appellant's counsel had a good reason for doing so. For example, he may have wished to severely curtail the cross-examination as to these two criminal offenses. In other words, the Colclough and Bonetti offenses were denied by appellant's plea of ''not guilty.'' Consequently, an unnecessary denial from the witness stand would have subjected appellant to extensive and possibly harmful cross-examination. In short, it is apparent that counsel's omission was at most an error in judgment or trial strategy and not one which deprived appellant of effective representation nor did it reduce his trial to a sham or farce.

### III—The Lineup

Appellant's final contention for reversal is that the

lineup procedure unfairly tainted his in-court identification and resulted in such unfairness as to infringe his right to due process (*Stovall* v. *Denno,* 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967, 1972] ; *People* v. *Harris,* 67 Cal.2d 866, 872 [64 Cal.Rptr. 313, 434 P.2d 609] ; *People* v. *Caruso,* 68 Cal.2d 183, 186-187 [65 Cal.Rptr. 336, 436 P.2d 336] ). He complains because he was the only person in the lineup who was 6 feet, 3½ inches tall and boldly asserts that he was identified by Osaka, Colclough and Agema because of his unusual height.[5]

We find nothing in the record to support appellant's contention that the lineup was unfairly conducted. On the contrary, it consisted of five Caucasian males who were all reasonably similar in both dress and appearance. All of the men were of medium build, clean shaven with hair cut long and side burns. None wore glasses, and their respective heights from left to right in the lineup were 5 feet 10 inches, 5 feet 9 inches, 6 feet, 5 feet 10 inches, and 6 feet 3½ inches. Moreover, with the exception of Mr. Agema, none of the witnesses had described appellant as more than 6 feet tall; Bonetti fixed appellant's height at around 5 feet 11 inches, and both Colclough and Osaka estimated his height at 6 feet. Thus, the men who were placed in the lineup with appellant came closer to the suspect's general description than appellant, and if anything appellant's unusual height should be inured to his benefit. Also, when Osaka viewed the lineup, he was not even sure that appellant was the one who robbed him ; he identified appellant as the culprit only after he heard the men speak. And, significantly, Agema, the only witness who had described defendant's height at around 6 feet 3 inches, did not identify appellant from his height; he asked the men to turn around and then identified appellant by the back of his head and neck.

The judgment is affirmed.

Conley, P. J., and Stone, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 26, 1969. Peters, J., was of the opinion that the petition should be granted.

---

[5]The lineup in the instant case was conducted prior to *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]. Thus, appellant's right to counsel at the lineup is not in issue (see *People* v. *Feggans,* 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21] ).