[Crim. No. 3221. Fifth Dist. Nov. 13, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT AVALOS et al., Defendants and Appellants.

702

COUNSEL

Benjamin R. Winslow, Quin Denvir and Paul Halvonik, State Public Defenders, under appointments by the Court of Appeal, Gary S. Goodpaster, Chief Assistant State Public Defender, Richard E. Shapiro, Deputy State Public Defender, Gallagher, Soley & Gollmer and John Gallagher for Defendants and Appellants.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Vincent J. Scally, Jr., John W. Spittler, Charles J. James and Gregory W. Baugher, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**FRETZ, J.**\*—Robert Avalos and David Becerra separately appeal from judgments against each of them, after a joint trial, of conviction of violation of Penal Code section 187 (murder in the first degree) and of Penal Code section 211 (robbery in the first degree) and of Penal Code section 459 (burglary in the first degree).

Each appellant was sentenced to state prison for the term prescribed by law for violation of Penal Code section 187. Sentences on counts II and III were stayed pending appeal, with the stay to become permanent when the sentence was completed as to count I (murder). Each filed timely notice of appeal.

*Assigned by the Chairperson of the Judicial Council.

### Avalos' Bases for Appeal.

1. That the trial court erred in giving CALJIC No. 2.04 re fabrication of evidence without limitation as to its applicability only to Mr. Becerra.

2. That it was prejudicial error to fail to instruct that the testimony of an accomplice must be viewed with distrust.

3. That it was prejudicial error to fail to instruct concerning adoptive admissions.

4. That it was prejudicial error for the trial judge to conclude he had no authority to invoke the provisions of Penal Code section 1202b in the sentencing of Mr. Avalos.

5. Inadequacy of counsel.

### Becerra's Contention on Appeal.

1. That the failure of the court to instruct the jury on lesser offenses due to diminished capacity was prejudicial error.

### Statement of the Facts.

On August 3, 1976, four men were observed in a two-tone lowered green Chevrolet pulling into the driveway in front of the Sno-White Drive-In in Kingsburg. Paula and Raymond Morton, with their friends, the Rochas, had stopped at the drive-in and the Mortons particularly noticed the green Chevrolet because the lowered body was scraping the pavement. The lowered Chevrolet stopped briefly alongside another car in the driveway driven by Josie Tellez. Ms. Tellez testified that she knew David Becerra and one of the other passengers, Eddie Singh, in the car but did not recognize the third and fourth passengers in the vehicle.

The green Chevrolet left the Sno-White area and proceeded to the Circle-K Market next to the drive-in. The car stopped for a few seconds and then drove on behind the Circle-K Market. Shortly afterward a man walked around an ice machine on the south side of the market. He paused briefly by the door of the Circle-K Market and looked in the window. After a few seconds he returned to the back of the market. He again came to the front of the Circle-K Market, looked in the window a second time and then returned to the area of the icebox. While at the

icebox he was joined by another man, and the two of them went into the store.

. A third person came to the front of the store passing by the icebox and looked in the window. This man also left after looking inside the store, and thereafter returned with a fourth man. These latter two men went into the store, and one of the men was said to be carrying an object. Ms. Tellez identified the man carrying the object as Edward Singh. One witness thought what was being carried "looked like a gun" while another merely stated, "It looked like something brown, like it would be wood or something of that effect."

Somewhere between 30 seconds to a minute later a loud noise was heard by witnesses and all four men came out of the market. One of the men, identified by Ms. Tellez as David Becerra, appeared to be carrying something as he exited the store. One of the witnesses thought the man appeared to be carrying a case of beer.

The four men went to the back of the store and the same Chevrolet was then observed coming out from behind the store with its headlights off. The car proceeded west on Conejo Street, and the Mortons called the police on their CB radio. Upon receiving the radio dispatch, an officer proceeded to Conejo Street, pursued the vehicle, and after a high speed chase, stopped a Chevrolet. All four of the occupants were placed in custody. Two of the occupants were identified as Mr. Avalos and Mr. Becerra. Officers noted that there were two cases of beer and a shotgun in the front of the car, and a wallet was later discovered in the glove compartment. The wallet contained a driver's license with the name Marshall Wright. Another officer responded to the Circle-K Market. He observed Marshall Wright lying behind one of the two cash registers in the store. Mr. Wright appeared dead when the officer arrived. He was lying on the floor with a magazine rack lying over his body. His wallet was missing.

During the booking process each of the defendants spoke clearly. The gait of each of them seemed to be unimpaired.

Each of the defendants testified. Robert Avalos testified he started drinking beer early on the morning of August 3. Between 9 and 10 a.m. he went to a job training program and later met Eddie Singh at the house of Singh's sister. There they smoked marijuana and drank more beer. They then drove around town, picked up a friend named Gregg, drank more beer and smoked more marijuana.

Between 4 and 6 p.m. Robert, Eddie and Gregg met David Becerra and Valentine Rivera in a park in Selma. Avalos says that while at the park he drank some whiskey and left the park with Eddie, Val and David in the 1969 Chevrolet which was involved in this incident.

Mr. Avalos says that upon leaving the park the four purchased some more beer and proceeded to the house of Val's brother-in-law where they picked up a gun. They wanted to pick up a gun so they could do some hunting. The gun was placed in the trunk of the car. The four then continued to drive around drinking and shooting at bottles. They went to the Circle-K Market in Kingsburg.

Avalos testified that he planned to steal some beer at the Circle-K Market and went into the store for that purpose. He thought Becerra had followed him into the store. While Avalos was standing near the area where beer was shelved, a shot was heard. Avalos says the next thing he recalls was that he jumped in the car and drove off.

Becerra said substantially the same thing. Becerra said that at the time he and Avalos entered the Circle-K Market he was drunk, that he had told Val Rivera and Eddie Singh to stay in the car. Becerra helped Avalos get some beer from the cooler. When the shot was fired Becerra recalls rushing out and that all four left in the car.

From tests made later when the blood alcohol content was lower, the chemist testified the blood alcohol level of Avalos at the time of the incident at the Circle-K was between .12 and .16, and the blood alcohol of Becerra was .16 to .20.

During the time that Avalos and Becerra were in a patrol car, the conversation between the two of them was taped. That conversation, important to two of the contentions of Avalos, is set forth in appendix A.

RE CONTENTIONS OF AVALOS

1. THE INSTRUCTION ON FABRICATION OF EVIDENCE WAS NOT REQUIRED TO BE LIMITED BECAUSE THERE WAS EVIDENCE FROM WHICH THE COURT AND JURY MIGHT REASONABLY INFER THAT THE DEFENDANT HAD FABRICATED EVIDENCE.

■ Appellant Avalos contends it was reversible error for the court to give CALJIC No. 2.04, without limiting it to Mr. Becerra only.

That instruction was given because of the conversation between Avalos and Becerra which was recorded. (Appen. A.)

Counsel for Avalos contends there is nothing in that conversation indicating Avalos in any way fabricated or attempted to fabricate evidence.

It is true that Becerra spoke the only express words about telling the same story, but there is evidence *in* the conversation and *outside it* from which jurors might reasonably infer that Avalos had manufactured his contention that he was intoxicated. Witnesses testified his gait and speech were good. His own testimony showed he remembered what happened. His gait, speech and recollection plus the way he talked to Becerra allow more than one reasonable inference and constitute a question of fact for the jury. Therefore, it was not error to give the unlimited instruction.

2. THE FAILURE TO INSTRUCT THAT THE TESTIMONY OF AN ACCOMPLICE SHOULD BE VIEWED WITH DISTRUST (CALJIC NO. 3.18) WAS NOT ERROR.

In the recorded conversation between Avalos and Becerra, Becerra told Avalos what Valentine Rivera had said on the tape, that Eddie had the gun and fired it, that Becerra tried to open the cash register, that Avalos "got the wallet."

The requested instruction says in part, "The testimony of an accomplice ought to be viewed with distrust." Avalos contends Rivera "testified" because of the taped Becerra statement as to what Rivera had said.

Testimony is evidence given by a witness under oath. Rivera's statements were not those of a witness given under oath. They were contained in Becerra's statement which also was not under oath. Though hearsay, it was admissible for a purpose we shall discuss. Under the circumstances, it was not error to fail to give CALJIC No. 3.18.

3. IT WAS ERROR TO FAIL TO INSTRUCT CONCERNING THE ADOPTIVE ADMISSION OF AVALOS BUT THE ERROR WAS NOT PREJUDICIAL.

Avalos contends the trial court had a duty to instruct the jury concerning the use of the accusation of Rivera as related by Becerra in the taped conversation between Becerra and Avalos. The conversation

between Becerra and Avalos was hearsay. At least one ground for its admission was that it came within the adoptive admissions exception (Evid. Code, § 1221).

Respondent argues that Becerra's words were not "accusations" and that Avalos was not silent. "An accusatory statement is a statement expressed directly to a person or in his presence accusing him of a crime or tending to connect him with its commission. [Citations.] It is 'a statement...made by another person in the presence of a party to the action, containing assertions of fact which, if untrue, the party would under all the circumstances naturally be expected to deny....' (McCormick on Evidence, § 247, p. 528.)" (*People v. Moore* (1963) 211 Cal.App.2d 585, 597 [27 Cal.Rptr. 526].)

Becerra related to Avalos that Rivera told the police that Avalos had taken the wallet. This statement implicates Avalos in the robbery of the Circle-K Market and the murder of Marshall Wright. It places him at the scene and labels him an active participant. Avalos' remark, "Oh Shit," could be construed as a tacit admission or it might be interpreted as a denial. Thus, the trial court had a duty to give a cautionary instruction (CALJIC No. 2.71.5 (3d ed. 1970)[1]) on its own motion (*People v. Atwood* (1963) 223 Cal.App.2d 316, 331-333 [35 Cal.Rptr. 831]).

The statement constitutes an accusation. Whether the reply of Avalos is a denial or a failure to deny is a question of fact. CALJIC No. 2.71.5 tells the jury that unless it finds the conduct of the defendant was an admission that the accusation was true, the jurors should entirely disregard the statement. Thus, the instruction applies to situations where an ambiguous answer or conduct in reply is to be interpreted. Failure to give CALJIC No. 2.71.5 was error.

### Was The Error Prejudicial To Avalos?

■ Prejudicial error results only "...if upon a reweighing of the evidence it does not appear reasonably probable that a result more favorable to defendant would have been reached in the absence of the error" (*People v. Beagle* (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1], and cases therein cited). Reversal should be declared only when "'*after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has re-*

---

[1]All CALJIC instructions referred to are from the third edition (1970) unless otherwise noted.

*sulted in a miscarriage of justice.'"* (*People* v. *Watson* (1956) 46 Cal.2d 818, 834 [299 P.2d 243], italics in original.) Such an examination here convinces the court the error was not prejudicial.

### 4. THE JUDGE DID EXERCISE HIS DISCRETION IN NOT INVOKING PENAL CODE SECTION 1202b.

On sentencing appellant Avalos, the court stated as follows: "In view of the nature of the offenses—offenses of which the defendant stands convicted by the jury, in view of his prior record, the court feels it *cannot* invoke the provisions of Penal Code—Penal Code section 1202 (b) and that request is denied." (Italics added.) ■ Appellant claims the court did not exercise its discretion in that the court felt it "cannot" invoke Penal Code section 1202b.

On the contrary, the recitation by the court that the prior record of the defendant and the nature of the offenses of which he was convicted in this case caused him to feel he could not invoke Penal Code section 1202b is a showing of the exercise of discretion.

Counsel for Avalos emphasizes the words of the judge "*cannot.*" Counsel says this implies the judge felt he had no authority to invoke section 1202b.

However, in the context of the comments made by the judge, it is obvious that he meant he could not under the circumstances of the defendant and his case. This was not error.

### 5. EFFECTIVE ASSISTANCE OF COUNSEL.

Appellant Avalos makes an additional claim of error asserting that he was represented by ineffective court-appointed counsel at trial which violated his constitutional right to adequate representation. Avalos states three reasons why his trial counsel was inadequate:

"1. Failure to fully investigate and present a diminished capacity defense following receipt of the psychiatric report and evaluation of J. Frank James, M.D. on November 5, 1976;

"2. Failure to declare a conflict of interest with co-defendant Valentine Rivera who was represented by a member of the same law firm;

"3. Failure to object to the introduction or use of the tape-recorded conversation between Robert Avalos and David Becerra."

██ ██ ██ The standard to be applied is contained in *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859]. The court states: "Since the state is constitutionally required to provide indigent defendants with counsel (*Gideon* v. *Wainwright* (1963) 372 U.S. 335...; see *Gordon* v. *Justice Court* (1974) 12 Cal.3d 323, 332...), a conviction may not be upheld if the state has furnished an indigent with representation of lower quality than that of a reasonably competent attorney acting as a diligent, conscientious advocate." (*Id.*, at p. 424.)

The Supreme Court of California further said: "[The right to constitutionally adequate legal assistance] is denied if trial counsel makes a critical tactical decision which would not be made by diligent, ordinarily prudent lawyers in criminal cases." (*Ibid.*)

"...[T]he burden of providing a claim of inadequate trial assistance is on the appellant. [Citation.] Thus, appellant must show that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, appellant must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." (*Id.*, at p. 425.)

"In some cases, however, the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal." (*Id.*, at p. 426.)

We consider the reasons advanced by Avalos as to why his trial counsel was inadequate in order.

██ 1. Failure to fully investigate and present a diminished capacity defense of mental retardation following receipt of the psychiatric report and evaluation of J. Frank James, M.D., on November 5, 1976.

██ As was said in *People* v. *Frierson* (1979) 25 Cal.3d 142, 160-161 [158 Cal.Rptr. 281, 599 P.2d 587], "...to render reasonably competent assistance, an attorney bears certain basic responsibilities, including the investigation of available defenses and, in an appropriate case, the obtaining of a psychiatric examination."

██ The claimed error in this case is not that defense counsel failed to obtain a psychiatric report. The report of J. Frank James, M.D., a psychiatrist, was made to defense counsel. A copy of it was later at-

táched to the probation officer's report. Appellant Avalos contends that the report of Dr. James itself showed that further steps should have been taken in the investigation of a diminished capacity by reason of mental retardation defense. An examination of the report of Dr. James is crucial to a determination of this question. Dr. James was appointed by the court at the request of the appellant. Had the defense of diminished capacity by reason of mental retardation been used, the report of Dr. James or the testimony of Dr. James could have been used by either side.

To Dr. James, Mr. Avalos stated, "I was feeling good. No, I wasn't drunk." While the statements made by Avalos at trial as to the amount he had to drink along with other evidence, might belie his statement that he was not intoxicated, his own statement that he "wasn't drunk" could do considerable damage to the defense which he did use, to wit, the defense of diminished capacity by reason of intoxication. Furthermore, it would attack his credibility to the extent that in his conversation with Becerra he stated that he was intoxicated and that that would be his defense. To use the contradictory statement in Dr. James' report could impeach his testimony and thus impair his primary defense.

Further, there are detailed statements to Dr. James about specific things which happened during the course of the day and even during the course of the events at the store at Kingsburg. His specific recollection would further tend to belie his intoxication defense. The doctor says, "Mr. Avalos appears to understand the nature of the charges against him. He appears to know the difference between right and wrong and is aware of the possible consequences of the alleged incident. . . . Mr. Avalos denies that he was drunk at the time of the incident and has very specific recollection for all of the events preceding, at the time of, and following the incident. . . . He describes a specific intent, 'to steal some beer,' and, therefore, I do not believe there was diminished capacity."

The doctor indicated that the tests which he had given Mr. Avalos to obtain some indication of Mr. Avalos intelligence quotient were merely a screening device. These tests indicated to the doctor that Mr. Avalos' I.Q. was "around 70." The doctor further states his understanding that the defense of diminished capacity is available only if the I.Q. is below 65. The doctor thought that because of Mr. Avalos' grade in school and his vocabulary a more specific test might show an I.Q. of higher than 70. The doctor said that "it may be helpful to obtain actual psychologi-

cal testing for a more precise determination of his intelligence and I will be very glad to arrange such testing, if you so desire." It is this sentence which causes the appellant to attempt to invoke *Pope* and *Frierson.*

We believe this case is clearly distinguishable from *Pope* and *Frierson.* Here, psychiatric evaluation was requested and had been obtained. It is true that the doctor had suggested that if psychological evaluation were deemed appropriate he would be glad to make the arrangements for it. The doctor felt that it might be helpful. However, there was another defense available to the defendant. The defendant himself had settled upon the defense of intoxication as the basis for diminished capacity. Supported as it was by the testimony of appellant, the defense seemed to have merit. It is obvious, however, that the testimony of Dr. James would render suspect, if it did not totally destroy, the defense of diminished capacity by reason of intoxication.

When the reasons for the tactical decision are so apparent from the record, the appellant has failed to bear his burden of showing that his attorney acted in a manner other than that expected of other reasonably competent attorneys acting as diligent advocates. Furthermore, he has failed to establish that his counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense.

We bear in mind that the thrust of the *Pope* decision is that not only the trial itself but also the investigation and preparation of the case are matters of inquiry and concern. Here, however, ample reasons for the tactical decision of the trial attorney appear on the face of the record. We find that it was not error to further investigate the matter of a diminished capacity defense of mental retardation.

2. Failure to declare a conflict of interest with codefendant Valentine Rivera who was represented by a member of the same law firm.

The record here reflects that during voir dire examination the attorney who represented Avalos informed the panel that he was associated with an attorney who represented a codefendant, Valentine Rivera, who was not tried with Avalos and Becerra. Rivera's attorney did appear at the Avalos-Becerra trial when Rivera was called as a witness, but Rivera did not testify at the Avalos and Becerra trial. Rivera and Avalos were facing the same charges involving the same set of facts. However, Rivera did plea bargain with the prosecution. One defendant chose to go to trial pleading not guilty while the other pled guilty to a lesser of-

fense. Thus, there are obvious differences in the positions taken by the two defendants during the course of the trial.

California State Bar Rules of Professional Conduct, rules 5-101 and 5-102, deal with avoiding adverse interests and representation of adverse interests. The American Bar Association in its Standards Relating to the Administration of Criminal Justice-The Defense Function, standard 3.5 (b), at page 123, cautions: "Except for preliminary matters such as initial hearings or applications for bail, a lawyer or lawyers who are associated in practice should not undertake to defend more than one defendant in the same criminal case if the duty to one of the defendants may conflict with the duty to another."

In this case the record is void of any showing that representation of Valentine Rivera and the appellant by different but associated attorneys prejudiced the appellant or caused him to lose any potential defense. Since the burden is upon him to show these things we find there is no showing of the inadequacy of counsel on this ground.

3. Failure to object to the introduction or use of the tape-recorded conversation between Robert Avalos and David Becerra.

The conversation was important. Because of it, the judge instructed upon the possibilities of fabrication of evidence. As we have also indicated, the judge erroneously failed to instruct concerning an adoptive admission.

If the evidence was properly admitted, the failure of defense counsel to object would be immaterial.

The evidence was admissible as to appellant Avalos upon several grounds. First, to the extent that the conversations were offered to prove the truth of the matters stated, they constituted hearsay because they were made outside the current trial. To the extent that they were not offered to prove the truth of the matters stated, they would not constitute hearsay. (Evid. Code, §§ 225, 1200.) An out of court statement of a criminal defendant becomes admissible as his admission whether it acknowledges complete guilt (a confession) of an offense charged or some lesser fact that tends to prove guilt. (Evid. Code, §§ 1220-1223.)

Here, the conversation tended to show that Avalos and Becerra were present at the store with Eddie and Val. Second, as to appellant Avalos, some portions of the conversation can be interpreted as an adoptive ad-

mission. (Evid. Code, § 1221; Jefferson, Cal. Evidence Benchbook (1972) §§ 3.2, 3.4.)

Because the conversation was thus admissible, it was not error on the part of defense counsel to fail to object.

### RE CONTENTION OF BECERRA.

We turn now to the appellant Becerra's sole contention on appeal and find that THE FAILURE OF THE COURT TO IINSTRUCT THE JURY ON LESSER OFFENSES DUE TO DIMINISHED CAPACITY WAS NOT PREJUDICIAL ERROR.

Appellant complains of and assigns as prejudicial error the court's refusal to instruct on:

(a) Voluntary manslaughter—absence of malice due to diminished capacity (CALJIC No. 8.41).

(b) Doubt whether murder or manslaughter (CALJIC No. 8.72).

(c) Diminished capacity to form requisite specific intent to commit the underlying crime in felony murder (CALJIC No. 8.79).

As pertains to the felony-murder charge, the court did instruct on first degree felony murder (CALJIC No. 8.21),[2] diminished capacity (CALJIC No. 3.35), voluntary intoxication (CALJIC No. 4.21)[3] and concurrence of act and specific intent (CALJIC No. 3.31).[4]

---

[2]CALJIC No. 8.21 as given: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a result of the commission of or attempt to commit the crime of robbery or burglary, and where there was in the mind of the perpetrator the specific intent to commit either of such crimes is murder of the first degree.

"The specific intent to commit robbery or burglary and the commission or attempt to commit either of such crimes must be proved beyond a reasonable doubt."

[3]CALJIC No. 4.21 as given: "If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such specific intent or mental state.

"If from all the evidence you have a reasonable doubt whether defendant was capable of forming such specific intent, you must give the defendant the benefit of that doubt and find that he did not have such specific intent or mental state."

[4]CALJIC No. 3.31 as given: "In [each of] the crime[s] charged in _____, _____ and _____ of] the information, [namely, felony, murder, robbery and burglary] there must exist a union or joint operation of act or conduct and a certain specific intent in the

Appellant Becerra's contention of prejudicial error is not well taken.

Murder is the unlawful killing of a human being with malice aforethought. (Pen. Code, § 187, subd. (a).)

Murder committed "in the perpetration of...robbery (or) burglary ...is murder of the first degree...." (Pen. Code, § 189.)

Here the parties agree that the case was presented to the jury under the felony-murder doctrine only. ▮▮▮ As Witkin puts it, "The ordinary elements of first degree murder—malice and premeditation—are eliminated by the doctrine. The only criminal intent required is the *specific intent to commit the particular felony.*" (Witkin, Cal. Crimes (1963) § 311, p. 283, italics in original.) It follows that if the diminished capacity defense convinces the jury that a defendant did not have the specific intent to commit the particular felony relied upon, then neither murder nor the underlying felony was committed.

Appellant argues and it is true that *People v. Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911], recognized "nonstatutory" voluntary manslaughter. It results from the unlawful killing of a human being in a situation which would have been first degree murder but for the absence of malice aforethought. (*Id.*, at p. 318.) Of course, *Conley* does not apply to felony murder because malice aforethought is not an element of murder under the felony-murder doctrine.

Appellant then cited *People v. Griffin* (1971) 18 Cal.App.3d 864 [96 Cal.Rptr. 218], for the proposition that failure to give a nonstatutory manslaughter instruction, *sua sponte*, is prejudicial per se where the defense of diminished capacity is properly before the court and the court has been alerted to it by the evidence presented. That proposition is true where the case is tried on some theory of murder other than felony murder. In *Griffin*, careful reading of the opinion itself[5] shows the case

mind of the perpetrator and unless such specific intent exists the crime to which it relates is not committed.

"In the crime of felony murder, the necessary specific intent is to commit robbery or to commit burglary.

"[In the crime of robbery, the necessary specific intent is to permanently deprive the owner of his property.]

"[In the crime of burglary, the necessary specific intent is to steal, take and carry away the personal property of another with the specific intent to deprive the owner permanently of his property.]"

[5]Headnote 1a-1c in *Griffin* is in error where it says, "In a prosecution for first degree murder under a felony-murder theory, it was reversible error for the trial court to fail to give, *sua sponte*, instructions relating to nonstatutory voluntary manslaughter...." (*Id.*, at p. 865.) The case does not stand for that proposition.

was tried on murder grounds in addition to felony murder. (*Id.*, at pp. 868, fn. 1, 870.)

 When, as in this case, the reliance of the prosecution is placed only upon felony murder, it would be error to instruct on nonstatutory voluntary manslaughter. "[Felony murder] is a 'highly artificial concept,' a special expression of state policy designed as a deterrent to the use of deadly force in the course of the enumerated felonies, embracing accidental or negligent as well as deliberate killings." (*People v. Johnson* (1974) 38 Cal.App.3d 1, 8 [112 Cal.Rptr. 834].) It dispenses with premeditation and malice as elements of first degree murder. (*Id.*, at p. 8.) CALJIC No. 8.41 was not and should not have been given.

The court correctly instructed the jury on first degree felony murder (CALJIC No. 8.21). It properly instructed as to the effect of diminished capacity upon a defendant's ability to form a specific intent (CALJIC No. 3.35).

 We now discuss whether the court properly instructed that appellant's diminished capacity might rebut each of the specific intents necessary to a finding of a killing in the perpetration of a robbery or burglary.

As is shown by the instructions given (fns. 3-5), the judge gave CALJIC No. 3.31 on concurrence of act and specific intent. In it he correctly set forth the specific intent required for robbery and burglary. He also said, "In the crime of felony murder the necessary specific intent is to commit robbery or to commit burglary."

As appellant says, it is true that felony murder itself does not require a specific intent. The specific intent required in this case is the intent to commit burglary or robbery. But while it may be technically inartful to say, "In felony murder the specific intent is. . ." it is truthful and proper to say the necessary specific intent for the underlying felonies, here robbery and burglary, must be found. Jurors would understand from the instructions in this case what specific intent they must find. As was said in *People v. Romo* (1975) 47 Cal.App.3d 976, at page 990 [121 Cal.Rptr. 684]: "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole. We must also assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. (*People v. Henley* (1969) 269 Cal.App.2d 263.)"

In *People* v. *Mosher* (1969) 1 Cal.3d 379, 392-393 [82 Cal.Rptr. 379, 461 P.2d 659], our Supreme Court said: "By failing to instruct the jury that defendant's diminished capacity might rebut each of the specific intents necessary to a finding of a killing in the perpetration or attempt to perpetrate rape, burglary, or robbery, and hence rebut the prosecution's felony-murder theory of first degree murder, the trial court deprived defendant of his constitutional right 'to have the jury determine every material issue presented by the evidence.' [Citation.]"

Here the combination of CALJIC No. 3.35 and CALJIC No. 3.31 told the jury exactly the same thing as is contained in CALJIC No. 8.79.[6] Again, the jurors were admonished to consider all the instructions as a whole and to regard each in the light of all the others (CALJIC No. 1.01).

We find as a result that no error was committed.

Furthermore, even if the trial court erred by omitting diminished capacity instructions regarding murder and manslaughter (CALJIC No. 8.79), such error was harmless.

It is settled that the erroneous failure to instruct on a material issue presented by the evidence is harmless if the factual question posed by the omitted instruction was actually resolved adversely to the defendant. (*People* v. *Mayberry* (1975) 15 Cal.3d 143, 158 [125 Cal.Rptr. 745, 542 P.2d 1337]; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913].)

The jury in this case returned verdicts of first degree robbery and first degree burglary against appellants. Clearly, under the nondisputed robbery, burglary and diminished capacity instructions given by the court, the jury rejected appellants' diminished capacity defense and returned guilty robbery and burglary verdicts. A guilty murder verdict necessarily flowed from the guilty verdicts on the robbery and burglary counts. Appellants do not dispute that the jury was properly instructed

---

[6]CALJIC No. 8.79 reads as follows: "Before the defendant may be found guilty of the unlawful killing of a human being as a result of the commission or attempt to commit the crime of _____, you must take all the evidence into consideration and determine therefrom if, at the time of the commission or attempt to commit such crime, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent to commit such crime.

"If from all the evidence you have a reasonable doubt whether the defendant was capable of forming such specific intent, you must give the defendant the benefit of that doubt and find that he did not have such specific intent."

as to the relationship between diminished capacity and the necessary mens rea of robbery and burglary. Accordingly, even if the omission of the instructions appellants advanced were error, such error is harmless and appellants cannot prevail.

The judgment is affirmed as to each appellant.

Brown (G. A.), P. J., and Zenovich, J., concurred.

A petition for a rehearing was denied on November 29, 1979, and the following opinion was then rendered:

**FRETZ, J.\***—Appellant Avalos' contention pertaining to ineffectiveness of counsel and in particular, *People* v. *Frierson* (1979) 25 Cal.3d 142 [152 Cal.Rptr. 281, 599 P.2d 587], is fully discussed in the opinion. Appellant's remaining contention that the failure to give CALJIC No. 2.71.5 was prejudicial is meritless. Appellant relies on the fact that the trial jury had the transcript reread twice during deliberations. This rereading, however, may well have been necessitated by other questions that the jury had about the evidence regarding consciousness of guilt. Furthermore, in the absence of CALJIC No. 2.71.5, the jury would have considered Rivera's statement for the truth of the matter stated, i.e., that appellant in fact stole the wallet. Abundant evidence established that the wallet was stolen either by appellant or by persons he aided and abetted. Therefore, at worst, the evidence was cumulative. Appellant's reliance on *People* v. *Vindiola* (1979) 96 Cal.App.3d 370, 383 [158 Cal.Rptr. 6], is misplaced in that the evidence as to Valentine Rivera's statements was cumulative and went to an issue that was not the critical issue in the case. There was abundant evidence as to Avalos' burglary (stealing the beer) which supports a felony murder conviction. Appellant's statement that a verdict of second degree murder was entirely probable is patently incorrect. The jury received no second degree murder instruction.

Brown (G. A.), P. J., concurred.

The petition of appellant Avalos for a hearing by the Supreme Court was denied January 8, 1980.

---

\*Assigned by the Chairperson of the Judicial Court

## APPENDIX A

The following is typed directly from the transcript provided by the district attorney as People's exhibit No. 35 with no corrections or additions.

### CONVERSATION BETWEEN THE DEFENDANTS, BECERRA AND AVALOS, WHILE THEY ARE LOCATED AT THE VALLEY MEDICAL CENTER.

AVALOS: (Unintelligible).

BECERRA: (Unintelligible)...What did you say on the tape?

AVALOS: Most of the time I told them pendejo wadacho (stupid white guy).

BECERRA: Okay, he did too.

AVALOS: (Unintelligible)...This is what I told them. I told them I was all fucked up and I was, I didn't know nothing. I said I want to call my lawyer.

BECERRA: Val told me you were talking on the tape.

AVALOS: That's what I said. I said I was all fucked up.

BECERRA: I didn't say shit, man. All I said was I want to talk to my lawyer. I want a lawyer. Fucking Val, man. Did you hear what Val said on the tape?

AVALOS: What did he say, what happened?

BECERRA: You didn't hear that, man?

AVALOS: Un-ugh.

BECERRA: Man, he told them, he told them everything about me.

AVALOS: Spanish translation—also who killed him as well?

BECERRA: Yes.

AVALOS: Did he say Ed killed him?

BECERRA: Yeah, he said Eddie, Eddie, Eddie, but he didn't see Eddie shoot him, but he said that, you know. Eddie, Eddie had the gun and he fired it, came back running out. And he said I fucking tried to open the cash register. And he told them that you got the wallet.

AVALOS: Ay cabrone (Oh, shit).

BECERRA: Rato (rat). I am going to fuck Val up, man, if I see him in jail. (Spanish unintelligible)...he told them everything about me. He told them that he didn't want to do it that they were, that we were trying to make him do it, too. Fucking Val (puto) (bastard). The vato (dude) died, huh?

AVALOS: Uh-huh.

BECERRA: Fucking Ed shouldn't-a blew off his head.

AVALOS: His cabeza (head)?

BECERRA:

AVALOS: No.

BECERRA: Yeah, I didn't even want to look. God damn, man.

AVALOS/BECERRA: (Unintelligible).

BECERRA: Hey, well, as long as, you know what, they know we didn't kill the vato (dude). Me and you are going to go the the same tiempo (time). You know what, me and you should get our shit together, cause Eddie, saese (pal), ya estuvo con Eddie (it's all over for Eddie). They got the vato (dude) for murder. The vato (dude) is going to go up (unintelligible).

AVALOS: We're going to do the Christo signs.

BECERRA: Yeah, Bob, what do you want to say, man. Me and you get our fucking stories straight, hey?

AVALOS: Is that what happened? I don't know what happened. I was fucked up, man.

BECERRA: I don't know, hey, we just said that. Val told them everything you see.

AVALOS: I don't remember. I was fucked up. That's why they took my blood. And if they find drug alcohol in me they're going to say, you know, I was intoxicated and I don't know what I was doing.

BECERRA: Hmmm.

AVALOS: That's the one I'm going to keep, I'm going to keep to that one because it's the truth. I don't know what the fuck I was doing. I was fucked up.

BECERRA: You know what, we could just say...

AVALOS: That is what I am going to say, man.

BECERRA: Okay, you want me you want me, okay.

AVALOS: I don't want to give you phone number.

BECERRA: No, none of that. Okay, you want to say, let's me and you keep this story, the same story, Bobby, all right.

AVALOS: Ummm.

BECERRA: Okay, we were drunk you know, we didn't know what we were going. And you want to say this? Do you want to say, well we went in, man, you know, everybody, you know, everybody said they were going to go in. I mean, you know, we went in, I mean, you know, we didn't know somebody was going to come in with a gun. They're going to say who came in with a gun. I don't know, somebody just came in. And we were gonna buy the beer, and somebody came in and just "boom". And we just, you know, we were all fucked up, so we split. Huh?

AVALOS: Ummm.

BECERRA: Do you like that one or what?

AVALOS: I'm going to keep to mine—

BECERRA: Huh?

AVALOS: I'm going to keep to my story.

BECERRA: What story are you going to say?

AVALOS: That I was fucked up and I don't know what happened. I don't know if I went into the store or nothing.

BECERRA: Val pulled rata, Bobbie (i.e., Val snitched on us.).

AVALOS: I'm going to say I was intoxicated. I don't know if I did that or not, I don't know if I did that or not.

BECERRA: But he said you got the fucking wallet, turkey.

AVALOS: But I was drunk. I don't know if I did or not.

BECERRA: You can't say that.

AVALOS: He's going to back out of it, too.

BECERRA: Huh?

AVALOS:

BECERRA: I'm going to tell them I was stoned, man, I don't know what happened. I don't know who came in.

AVALOS: (Unintelligible).

BECERRA: I'm going to tell them we was smoking some angel dust. All right, Val, I mean, Bobby?

AVALOS: Ummm.

BECERRA: We smoke some angel dust, all right?

AVALOS: Ummm.

BECERRA: (Unintelligible).

AVALOS: We say we smoke some angel dust.

BECERRA: Huh?

AVALOS: Tell them that we smoke it and it was good, fucking-good.

BECERRA: It just happened all of a sudden.

AVALOS: (Unintelligible).

BECERRA: Just say me and you went into to get some cerveza (beer), me and you went to get some cerveza, we put it up on the thing and we were going to pay for it. I had twenty dollars but I lost it, huh?

AVALOS: Are you changing your story from what you told them? I already told them what my story was.

BECERRA: What did you tell them your story was?

AVALOS: That I was fucked, up, that I didn't know what the fuck was going...

BECERRA: I didn't tell them nothing.

AVALOS: I just said that and that's it, I want to call a lawyer. That's all I said, I was fucked up, I don't know what happened. I told them I was fucked up and I didn't know what the fuck they were talking about (unintelligible)...it will be all right, you'll see.

BECERRA: But, Bobby, they're going to ask you—well, we'll talk about it later in jail, all right?

AVALOS: I can say I don't know, I am going to keep it that way, too. Don't try saying what I did, keep you own, don't pull me in. Just say what you did yourself.

BECERRA: I'm just saying maybe me and you say the same thing we can get out of it.

AVALOS: Un-ugh.

BECERRA: Shit, Val fucking wants to get out of it. It wasn't planned that way. We'll get around ano (year), Bobby, me and you. Do ano (do a year). For damn sure I ain't going to take the murder rap.

AVALOS: That's what I am gonna say, I don't know.

BECERRA: Huh, huh?

AVALOS: That's what I'm going to say, I don't know.

BECERRA: I don't know who shot nobody, I didn't shoot nobody. I don't even know how to shoot a gun. I never shot a gun before. I'm gonna fuck and tell them I never shot a gun. I'm gonna tell them look at my record, man, see, see what you guys got me for, drunk, that's all. (unintelligible)...they don't catch me with a gun or nothing on, shit. I ain't no fucking murderer. What did they do to you in there, take your blood tests and that's all?

AVALOS: Uh-huh.

BECERRA: Fucking Val fucked up. Val fucked up, man. No witnesses, no nothing, Bobby. Val fucked it all up, Val fucked it all up. (Spanish word—apparent translation —how could he). (Unintelligible), Bobby. I hope you are in my fucking cell so I won't get fucked around. Then, I'm going to try to get out, I know a lawyer or something on bail, go back to court.

AVALOS: (Unintelligible).

BECERRA: Huh? I only got one.

AVALOS: Dos (two).

BECERRA: Who, you?

I only got one. I only got one small one—open container. Man, I wish they would hurry up.